In re Allen A. COURTRIGHT, Verna M. Courtright, Debtors.

Bankruptcy No. 385–00682(11).

United States Bankruptcy Court, D. Oregon.

Jan. 3, 1986.

Bradley O. Baker, Portland, Or., for Federal Land Bank.

Laura J. Walker, Portland, Or., for debtors.

## MEMORANDUM OPINION

HENRY L. HESS, Jr., Bankruptcy Judge.

On October 28, 1985 the court held a hearing to value the security interest held by the Federal Land Bank (FLB) in the farm and improvements owned by the debtors. The debtors were represented by Laura J. Walker and FLB was represented by Bradley O. Baker.

The parties disagree upon the standard to be followed by the court in determining the value of the security interest held by FLB.

■ The court believes that it should start with the fair market value of the property as that term is generally understood to be, i.e., the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time. The court should not use that value which would be obtained through a forced or quick sale. Neither party appears to disagree with this proposition.

■ The court believes also that the fair market value is that amount which would be agreed upon in a sale for cash wherein the buyer would obtain his or her own financing. It is inappropriate to consider a price which would be dependent upon the seller retaining a contract upon more favorable terms than the buyer might be able to obtain elsewhere. Such a price does not effect the market value of the property but rather represents adjustments in price to compensate for favorable financing terms granted by the seller.

Given that the court should start with fair market value of the property, the parties are in disagreement as to whether the value of the security interest should be based upon replacement cost to the debtors, which would be the fair market value without reduction, or should be the sum which the creditor would receive should it foreclose, which would be the fair market value less the costs of foreclosure and resale of the property.

In this case the amount owing upon the lien exceeds the market value of the property. The debtors argue that fixing the value of the lien at market value without deducting costs of foreclosure and resale would represent a windfall in that the creditor would receive more under the debtors' plan than the creditor would receive should

it foreclose. On the other hand the creditor asserts that if the debtors are permitted to retain the property at less than the market value the debtors will have received a windfall.

11 U.S.C. § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light to the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. (Emphasis supplied).

It appears that the underlined portion of the statute does not supply the answer to the question of whether the secured claim should be allowed in the amount which the creditor would receive on foreclosure or whether, instead, it should be allowed in the amount which it would cost the debtor to replace the property. The purpose of the underlined portion appears to care for the problem where the estate's interest is less than full ownership such as where the debtors' own only an undivided interest in the property. If the underlined portion were interpreted to mean that the value must be fixed at the amount which the creditor would receive on foreclosure, then the last sentence of the statute which provides that the value shall be determined in the light of the purpose of the valuation and of the proposed disposition or use of the property, would be surplusage. Such an interpretation would mean that the value should always be fixed at the amount which the creditor would receive upon foreclosure regardless of the purpose of the valuation and of the proposed disposition or use of the property. The test would not depend upon whether the debtor intended to release the property or intended, instead to retain and use the property. It is not appropriate for the court to ignore or give no effect to the language of the last sentence of the statute.

■ The court concludes that where the debtors intend to retain and use the property, it is appropriate that the amount in which the secured claim should be allowed is the fair market value of the property without reduction for the costs of foreclosure and resale, or, in other words, what it would cost the debtors to replace the property.

Three expert witnesses testified on the question of fair market value. Gary Plass testified that the realty and its improvements had a value of $158,000. Robert Burns fixed the value at $225,000. Joe Colvin, an employee of FLB fixed the value at $205,000.

Counsel in their memoranda lay stress upon the appraisal of Burns and of Plass. Considering the reports and the testimony of these two appraisers we find the following differences.

■ Regarding the improvements Burns fixed a total value of $66,500. Plass fixed a value of $50,800. The difference is $15,700. Plass took into account that the residence was insulated with urea foam which is believed by some to constitute a health hazard. He estimated it would cost $10,000 to replace the foam insulation. Burns did not take into account the insulation and therefore made no deduction. The court concludes that, whether or not urea foam actually constitutes a health hazard, a seller of the property could be guilty of fraudulent misrepresentation if he failed to disclose the problem to a prospective purchaser. It would seem likely that if the problem were pointed out to a prospective purchaser it would affect the amount the purchaser would be willing to pay. Since the only evidence regarding the amount by which the sale price might be affected was the evidence that it would cost $10,000 to replace the insulation the court concludes that the value fixed by Burns should be

**498**

reduced by $10,000 to $56,500. This leaves a difference of $5,700. Both appraisers recognized that appraising is not an exact science but depends to some degree upon the judgment of the appraiser. It would seem to appear appropriate that the court fix the improvements at a figure between the figures of the two appraisers after adjusting for the insulation problem. The court therefore concludes that the improvements have a market value of $54,150.

Regarding the land Burns fixed the pasture land at $28,000 being 80 acres at $350 per acre. Plass fixed the pasture land at $21,840 being 84 acres at $260 per acre. Burns fixed the balance of the farmland at $132,000 being 160 acres at $825 per acres less $1,700 being the cost of treating 20 acres of alkali land with chemicals at $85 per acre. Plass fixed the balance of the farmland at $85,200 being 130 acres at $640 per acre or $83,200 plus $2,000 for the alkali land being 20 acres at $100 per acre.

Burns uses total acreage of 240 acres which is incorrect in that part of the land is occupied by roads. The correct total is 234, which is the figure used by Plass. The court also accepts that the pasture land is 84 acres and the balance of the land is 150 acres.

Regarding the alkali land Burns testified that the problem could be solved by the addition of chemicals at a cost of $5 per acre for chemicals and $80 per acre for application. The debtor testified that he has attempted to solve the alkali over a number of years using various recommended solutions, including the one suggested by Burns, to no avail. The court concludes that the 20 acres of alkali land should be valued at $100 per acre or $2,000.

Regarding the pasture land, Burns used a figure of $350 per acre whereas Plass used a figure of $260. The difference had to do with the comparison of soils of the subject land and of the comparable sales relied upon. The court finds that the figure used by Plass was correct and therefore concludes that the pasture land of 84 acres has a value of $21,840.

Regarding the remaining 130 acres, there was also a difference concerning soil types. The court concludes that the figure of $825 used by Burns is the correct figure. The court therefore concludes that the 130 acres has a value of $107,250.

Adding the value of the improvements of $54,150, the pasture of $21,840, the alkali land of $2,000 and the remaining 130 acres of $107,250 brings a total market value of $185,240. From this figure must be deducted the encumbrances which have priority in order to determine the value of the security interest of FLB. These consist of real property taxes of $2,763 and the security interest held by Commodity Credit Corporation in the grain storage building of approximately $3,000. The net value of the security interest of FLB is therefore $179,477.

This memorandum opinion shall constitute the court's findings of fact and conclusions of law.