**In re Marshell CLAEYS and Glora Claeys, Debtors.**

**Bankruptcy No. 87–05434.**

United States Bankruptcy Court,
D. North Dakota.

Sept. 14, 1987.

Joseph Turman, Fargo, N.D., for debtors.

Terry Wiles, Fargo, N.D., for First Nat. Bank of Oakes.

Kim Anderson, Minneapolis, Minn., for Aetna Life Ins. Co.

Wayne Drewes, Fargo, N.D., Trustee.

## MEMORANDUM OPINION

WILLIAM A. HILL, District Judge.

This matter is before the court on requests for section 506 valuations by secured creditors, Aetna Life Insurance Company (Aetna), holder of a mortgage in real property, and the First National Bank of Oakes (Bank), holder of a security interest in farm machinery and livestock. Also under consideration is the appropriate discount rate to be accorded Aetna pursuant to section 1225(a)(5)(B)(ii). A valuation hearing was held on August 18, 1987, in conjunction with a hearing on confirmation of the Debtors' Chapter 12 plan, confirmation of which was continued pending the results of the valuation as well as other modifications as might be necessary.

The Debtors and the Bank agree on the fair market value to be placed on both the livestock and machinery, but disagree on whether section 506(a) requires deduction of liquidation costs. The valuation of the real estate is entirely in dispute with the Debtors again taking the position that section 506(a) requires a deduction for liquidation costs.

### Findings of Fact

The facts as stipulated to and as adduced from the hearing testimony and exhibits are as follows:

1.

The Debtors are farmers in the Oakes, North Dakota area. They filed a Chapter 12 petition on May 1, 1987, and a plan of

reorganization on July 6, 1987. Except for several head of cattle and eight pieces of farm equipment to be returned to the creditors, the Debtors intend on retaining the bulk of the livestock, machinery and farmland. As presently formulated, the plan filed July 6, 1987, proposes to pay Aetna the value of its secured claim amortized over thirty years at an annual interest rate of 9¾ percent. As proposed, however, the value is to be reduced by 10% estimated liquidation costs and accrued taxes.

As agreed, the Debtors will be surrendering yearling cattle and a few miscellaneous cattle to the Bank but retaining the balance of their herd. The total dollar value of their herd, including the cattle to be returned, is $44,311.57 as of August 17, 1987. According to the court's calculations based on Exhibit 2, the value of the yearlings being surrendered to the Bank is $5,415.40 thus leaving a dollar value for the retained livestock of $38,896.17. It is also agreed between the Debtors and the Bank that the farm equipment being retained has a cash value of $27,950.00. The Debtors propose that the value of the livestock and farm equipment also be reduced by estimated liquidation costs.

According to hearing testimony, if the livestock were disposed of by auction at the West Fargo Stockyards the total auction cost would be $8.50 per head and if trucking were required from the Debtors' ranch, the transportation charge would be $1.25 per hundred weight. The weight of the yearlings being returned is 218 hundred weight leaving 532 hundred weight being shipped for a total shipping expense of $665.00. The auction expense based upon $8.50 per head x 80 head (this being the number of head being retained) is $680.00. Although the total estimated livestock liquidation costs were estimated by the Debtors' expert to be $1,851.00, this estimate was based upon the total herd levels existing as of August 17, 1987, apparently without deduction for the proximate 31 head of yearlings being surrendered to the Bank. With this deduction being made, the total estimated livestock liquidation costs using the figures provided by the Debtors' expert would be $1,345.00. The Bank's president suggested, however, that the livestock could be marketed in Britton, South Dakota, a distance of only 40 miles and could be transported in three loads with Bank personnel doing much of the labor necessary to corral and pasture the animals. The Bank believed costs of rounding up might run around $500.00 with transportation costs being an additional $450.00.

The Bank president testified that costs associated with liquidating the machinery would consist of a 6% fee for auctioneer, clerking and advertising and possibly another $500.00 for transportation if the sale were held at a location other than the Debtors' farm. Using a figure of 6% the sale costs would be $1,677.00 plus an additional $500.00 transportation expense possible.

2.

The real property in question consists of 1,728.24 acres in the North Dakota counties of Dickey and Sargent situated approximately 20 miles southwest of the City of Forman, North Dakota. The land can be characterized as four distinct tracts of 160, 280, 640 and 648.24 acres respectively. In terms of use, there are 308 acres of irrigated crop land, 59 acres of irrigated corners, 45.4 acres of dry crop land, 1,290 acres of pasture and slough, 14 acres of roads and a 10 acre farm site upon which are situated several residential structures, graineries, grain storage facilities, machinery storage buildings and various other out buildings.

Aetna and the Debtors offered testimony of qualified real estate appraisers on the issue of fair market value and possible liquidation costs. Bernie Biboe, testifying for Aetna, reviewed the property in May, 1987 and, relying upon this inspection, comparable sales and soil comparisons placed a fair market value of $325,000.00 effective May 20, 1987. The contributory value of the buildings was set at $57,000.00 inclusive of $3,000.00 attributed to a center pivot irrigator in which the Bank is fully secured. Hans Loraas, testifying for the Debtors, also used a similar approach for his appraisal completed in December, 1986, and estimated the fair market value in December, as well as now, to be $295,000.00

with $62,500.00 being the contributory value of the improvements. Although Loraas is the more experienced of the two and has lived in the area of the subject property for many years, the court believes his analysis to be flawed from the standpoint of comparable sales. He used twelve comparables, the oldest being August, 1984, and the most recent being September, 1986. All his comparables were at least eleven months old and, save for two September, 1986 sales, were at least sixteen months old. Mr. Loraas nonetheless said his comparables indicated a trend. Biboe utilized eight comparable sales, seven of which occurred in 1987 and ranged in date from December, 1986 to April, 1987. Loraas looked at none of these comparable sales but at the hearing acknowledged the valuation placed on them by Biboe was correct. It seems to the court that if Mr. Loraas wished to discover what the true trends in the marketplace were that it would have been necessary to examine the 1987 sales.

■ Beyond the fair market value of the land itself, Aetna wishes an enhanced value to be attributed to 945.6 acres of crop land which have been placed under contract with the government's Conservation Reserve Program (CRP). 503.6 acres were put into this program in 1986 and 442 were placed in the program in 1987. The contracts run for ten years each and will generate an annual payment of $46.75 per acre on the '86 contract and an annual payment of $38.63 per acre on the '87 contract. These payments, say Biboe, are substantially higher than cash rents in the area and when discounted at a rate of 12% to present value, render an enhanced value of $100,000.00 which should be added to the base fair market value. The Debtor, Marshell Claeys, pointed out that the land even though signed up for the CRP program will qualify for payments only if seeded with cover and maintained. He said that presently he has 129 acres of the 1986 land seeded and must complete the rest by this fall to qualify. None of the 1987 land has yet been seeded. Biboe acknowledged none of his comparables contain CRP land and agreed that qualification depended upon how many acres were actually seed-

ed. Loraas considered the CRP factor but said because the program is new and its effects not yet reflected in the real estate market, he was unable to place a value on the fact of program participation. Whether the CRP will, over the life of the program, truly generate a surplus income stream that will command a per acre premium in the marketplace is, in the court's opinion, a matter of speculation at this point. There are simply too many unknowns including seeding and maintenance costs, possible program termination, possible withdrawal from the program, eclipsing cash rent prices/grain prices. The court cannot conclude with any degree of certainty what the market impact of the program might eventually be and accordingly, will attribute no enhanced value to the land in consequence of the CRP contracts. In consequence of the foregoing discussion, the court believes the opinion of Biboe to be most reflective of the subject property's fair market value and attributes a value of $322,000.00 to the land.

According to Loraas, the sale commissions one might anticipate on property would be 5% on the first $200,000.00, 4% on the next $100,000.00 and 3% on the next $100,000.00. This commission rate as applied to land having a fair market value of $322,000.00 would be $14,660.00.

3.

On the subject of discount rates, Michael Hall of Hall & Hall Mortgage Corporation, the company which services Aetna's North Dakota agricultural loans, testified that there are no thirty year loans available in the marketplace and that no lender would make loan on an operation that has no equity as is the situation with the Debtors. The principal due Aetna is $299,459.32 plus accrued interest of $76,791.78 and taxes advanced of $7,290.54. The indebtedness is evidenced by a promissory note dated January 9, 1979 in the principal sum of $325,-000.00. The note is amortized over 25 years at 9¾% with a balloon at the end of fifteen years. Aetna's rate for its best customers is 9¾% three year adjustable on a ten year loan amortized over twenty years. On a ten year fixed-rate loan the

interest rate would be 10½% to 10¾% providing the customer met substantial down payment requirements. In circumstances where the borrower is 100% leveraged and the term is thirty years, a rate of 13% to 15% might be expected, assuming a lender could even be found.

### Conclusions of Law

#### 1.

■■■ A Chapter 12 plan may provide for payments over a period longer than five years except in the case of allowed secured claims which are being accorded treatment consistent with section 1225(a)(5)(B)(i) and (ii). The holder of the secured claim must retain its lien and be provided:

> "The value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed *amount of such claim;*"

Similar language may be found in section 1129(b)(2)(A)(i)(II) and section 1325(a)(5)(B)(ii) and is often referred to as the "fair and equitable" requirement. The reference in these sections to the allowed amount of such claim is the equivalent of the value of the creditor's interest as determined by section 506(a). It is with this section we are concerned. Section 506(a) as relevant to the discussion provides:

> "(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

The issue presented is whether, in the context of plan confirmation, section 506 requires a claim be valued with regard for the likely expense of liquidation were the creditor to assume possession and dispose of the collateral. By what standard security interests in Chapters 11, 12 and 13 ought to be determined is controversial to say the least. Section 506 itself suggests that value is not a static determination but is a function of time dependent upon where, in the progress of the case, the valuation is made. The legislative history accompanying the section suggests that value of an asset may vary depending upon the context of the valuation hearing.

> " 'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6312.

Aetna and the Bank argue that because the Debtors are retaining the land, livestock and equipment, the value of their respective claims must be determined without any deduction for the costs of repossession or eventual liquidation. The Debtors, pointing to the language of section 506(a), say it defines collateral value not in the context of "appraised value" but in terms of the value of the creditor's interest in the property.

Whether a valuation is made without regard for potential costs of liquidation depends, it seems, upon the emphasis given to the first and second sentences of section 506(a). The first sentence, providing that the claim is secured to the extent of the value of the creditor's interest in the property, suggests that since it is the creditor's interest that is being valued and not the collateral itself, it should not make any difference whether the debtor is retaining the property. Yet, the language of the second sentence suggests that the proposed disposition or use of the collateral itself must be considered when determining

that value. Aetna places considerable reliance upon the case of *In re Courtright,* 57 B.R. 495 (Bankr.D.Or.1986) in which the court emphasized the concept of the use to which the collateral is being put by the debtor. In that case the court said if the value of a creditor's interest is to be uniformly determined based upon what a creditor could expect to receive upon foreclosure, then the second sentence mandating that valuation be determined in light of the use or disposition of the property would have no meaning. Placing emphasis on the second sentence, the court in *Courtright* held that where a debtor intends to retain and use the property the value of the creditor's interest is the fair market value of the property without any reduction for costs of collateral disposition. Collier's also suggests that the term "use" means that a valuation should be made in light of its use by the debtor. 3 Collier on Bankruptcy ¶ 506.04 (15th ed. 1986).

The idea that value is affected by a debtor's continuing use of the collateral is also expressed in *Matter of Crockett,* 3 B.R. 365 (Bankr.N.D.Ill.1980). In *Crockett,* the court opined that the term means that a creditor's interest should be valued with due regard to the value the collateral has to the estate and since the property is being retained, a liquidation value would be inappropriate. *Crockett* was later cited in the case of *In re Frost,* 47 B.R. 961 (D.C. Kan.1985) as standing for the proposition that when a debtor proposes to retain the collateral, a forced sale valuation is improper. The court in *Frost,* however, said that while a forced sale valuation is improper, a valuation premised upon a simulated conversion of the collateral into cash in the most commercially reasonable manner is the method to use where collateral is being retained and used by a debtor. *Frost,* 47 B.R. at 964. The *Frost* case focuses on the confusion generated by the two sentences of section 506(a). The fact that a debtor intends to retain the collateral does not emasculate the fact that it is in the first instance the creditor's interest in the collateral that must be valued. Indeed, even in adequate protection situations arising under section 361, the protection being afforded is only to the extent of the secured creditor's interest in the property. This interest has been likened to the value of the creditor's ability to take possession of and sell the collateral. *In re American Mariner Industries,* 734 F.2d 426, 435 (9th Cir.1984). The Eighth Circuit in *In re Ahlers,* 794 F.2d 388, 396 (8th Cir.1986) said that adequate protection is premised on the theory that a creditor bargains for the right to take possession of the collateral and sell it in the event the debtor defaults and in fashioning adequate protection one must determine what the creditor could have realized upon disposition, taking into account the usual time and expense involved in repossession and sale. Except for the *Courtright* decision, which appears to be an anomaly, courts when valuing a creditor's interest in property, generally project what could be recovered if the collateral were disposed of in a commercially reasonable manner, a concept which has been also termed "liquidation value" as opposed to a "forced sale" valuation. According to *Matter of QPL Components, Inc.,* 20 B.R. 342 (Bankr.E.D.N.Y.1982), such a standard takes into account a creditor's efforts to realize full economic value of its interest. This idea is also expressed in *In re Paige,* 13 B.R. 713 (Bankr.S.D.Ohio 1981) and *Matter of Parr,* 30 B.R. 276 (Bankr.N.D.Ala.1983) where the court said that "To determine 'the extent of the value of such creditor's interest', the court must determine what the bank would receive from the real estate upon its dispostion by customary and commercially reasonable means." *Parr,* 30 B.R. at 277. One commentator has suggested that any other construction is meaningless because regardless of the circumstance of bankruptcy or the eventual circumstances of repossession, a secured creditor, in order to obtain its value in collateral, will have to sell it and incur expenses in so doing. No creditor, and indeed not even the debtor itself could obtain full market value without some reduction for sale expenses. J. Queenan, *Standards for Valuation of Security Interests in Chapter 11,* 92 Com.L.J. 18, 29–

37 (1987).[1] Judge Queenan points out in his article that the fact a debtor is retaining the property has little to do with valuing the secured creditors' interest which consist of the right to foreclose and dispose of the property in a commercially reasonable fashion.

 The recent decisions out of the Eight Circuit suggest that Judge Queenan's analysis of section 506(a) is reflective of how a creditor's interest in collateral ought to be valued irrespective of whether the valuation is for purposes of adequate protection or plan treatment. The early and often quoted case of *In re American Kitchen Foods, Inc.*, 2 B.C.D. 715 (Bankr. N.D.Me.1976), a case decided under Chapter XI of the Act, went into a detailed analysis of the nature of collateral valuation and focused on the concept of liquidation value which in and of itself is not descriptive of how collateral ought to be valued. In that case the court, comparing the idea of a forced sale valuation against a standard based on commercial reasonableness, said that where a debtor is continuing to operate as a going concern and the collateral is going to be used in connection with that operation, the value of the collateral should be made in recognition of the "net recovery realizable from its disposition as near as may be in the ordinary course of the business". *Id.* at 722. It is important to note that the *American Kitchen Foods* case in distinguishing a commercial reasonableness standard as against a forced sale standard was not interpreting section 506(a), a code provision that did not come into existence until 1978. The emphasis to be placed upon the concept of "use" or "disposition" of property should not be placed in the context of collateral retention by a debtor via a reorganization plan, but rather ought to focus on a use or disposition of collateral that is either destructive or unanticipated in the sense that it would increase the risk of loss to the creditors' interest in the collateral. Illustrative of such use in a Chapter 12 treatment context might be a post-confirmation proposal to use a combine for custom work where previously it had been used seasonally to harvest the debtor's own crop. Thus, the second sentence of section 506(a) should not have any effect upon how the value of a creditor's interest in collateral is arrived at, at least in the context of collateral retention unless the manner of that retention is so unusual or extreme as to constitute a use that is destructive of the collateral itself in a way unanticipated.

This court while recognizing that evidence on value may vary from case to case adheres to the position that when the issue is the value of a secured creditor's interest in collateral, real or personal, one must uniformly take into account the anticipated costs of disposal. *E.g. In re Wolsky*, 53 B.R. 751, 757 (Bankr.D.N.D.1985). This court further believes that when a debtor in a Chapter 11, 12 or 13 case proposes to retain collateral, the potential costs of disposition should be those that would be anticipated by a creditor in disposing of property in a commercially reasonable manner.

 Accordingly, it is the opinion of the court that the usual costs attendant to converting the real property, farm machinery, and livestock to cash ought to be deducted in arriving at the allowed amount of secured creditors' claims. Utilizing this standard, the court finds the value of the Bank's interest in the retained livestock to be $37,766.17 (arrived at by deducting auction expenses of $680.00 and transportation expenses of $450.00 from $38,896.17) and its interest in the retained machinery to be $26,273.00 ($27,950.00 less auction expenses of $1,677.00). The court further finds the value of Aetna's interest in the real property to be $307,340.00 ($322,000.00 less sale expenses of $14,660.00).

### 2.

 The final issue to be resolved is whether the interest rate of 9¾% over thirty years is the appropriate discount rate to be accorded Aetna's secured claim. For a

---

1. For further reading on the interesting subject of valuations in bankruptcy, *see* Fortang & Mayer, *Valuation in Bankruptcy*, 32 U.C.L.A. L.Rev. 1061 (1985).

creditor to receive value, as of the effective date of the plan equal to the allowed amount of its claim, consistent with the requirements of section 1225(a)(5)(B)(ii), the payments under the plan must be discounted by an appropriate rate to reach present value. Although there are various methods available by which a discount rate may be ascertained, this court in *In re Edwardson*, 74 B.R. 831, 836 (Bankr.D.N.D.1987) said that the controlling case on point is *United States v. Neal Pharmacal Co.*, 789 F.2d 1283 (8th Cir.1986) which held that:

> [T]he appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default. *Neal*, 789 F.2d at 1285.

This language is also found in *In re Monnier Brothers*, 755 F.2d 1336 (8th Cir.1985) in which the court accepted the contract rate as the appropriate market rate because the contract was for a payment term equal to the plan proposal and the rate negotiated between businessmen was presumably reflective of the risk inherent in a long term agricultural loan. It is clear from these cases that regardless of whether the discount rate is pegged upon a market rate or original contract rate, the court must consider what the prevailing market rate would be for a loan of equal term and factor in the risks involved in the quality of the security. Although some bankruptcy courts have used the yield on a Treasury Bond together with a risk enhancement factor, *Matter of Doud*, 74 B.R. 865 (Bankr.S.D.Iowa 1987), this court believes the best evidence of what a discount rate ought to be is what a similar loan to a debtor in similar circumstances would cost in the marketplace. It seems that a creditor's own testimony as to what it would charge for a loan under a given set of circumstances best reflects upon each of the required inputs. Using the Treasury Bond rate as the base rate and then factoring in an adjustment which the court believes is compensatory of the risks involved seems arbitrary and unnecessary particularly in those cases in which as here a lender has introduced testimony bearing on the very issue. As suggested by *Monnier*, rates being offered in the marketplace by agricultural lenders have inherently factored into them the prevailing cost of money, prospects for appreciation or depreciation of the value of the security, and the risks inherent in long term loans. Although as this and other courts have noted, debtors in Chapter 12 are not as severe a credit risk as someone outside of bankruptcy, neither are they the best risk. In fact, according to the testimony, there is no loan of a similar nature to which the Debtors are presently proposing. Although the Debtors suggest in their brief that the contract rate of 9¾% is identical to the rate available to Aetna's best customers, it must be pointed out that the rate proposed in the plan is a thirty year fixed rate to a 100% leveraged borrower while the 9¾% market rate offered by Aetna is available only to their best customers and then for only a three year fixed term becoming adjustable thereafter.

■ The Debtors suggest that what ought to occur in this case is for the plan interest rate to remain fixed at 9¾% until 1995, the date when the contract would have ballooned, and then to become a three year variable rate pegged at 2.5% over the then prevailing three year treasury certificate rate. While this is an interesting approach that is perhaps worth further consideration, the court harkens back to the section 1225(a)(5)(B)(ii) and its requirement that a secured creditor be afforded the present value of its claim. As noted in *In re Hardzog*, 74 B.R. 701 (Bankr.W.D.Okla. 1987), in order for a creditor to receive value, as of the effective date of the plan, at least equal to the allowed amount of its claim, interest must be paid to provide full value for its claim because money received in the future is worth less than money received immediately. Addressing this

**994**

fundamental concept requires certain mathematical inputs. To compute what the present value of money is one must know the original amount, the period over which payments are to be made and the discount rate. A present value calculation simply cannot be made if the discount rate is unknown or to become variable in the future. Thus, while the approach suggested by the Debtors perhaps has merit in the context of creditor negotiations, it does not afford a basis upon which a court can determine whether or not a plan meets the present value test of section 1225. The closest marketplace comparison is the rate of 13% to 15% prevailing in the junk bond market assuming the Debtors were otherwise credit worthy. Based on the evidence before the court and the case law, the court believes an interest rate of 12% is appropriate in this case because it is reflective of the market rate for loans of similar term and quality and also takes into account the somewhat reduced risk inherent in situations where the borrower is a Chapter 12 debtor.

Accordingly, and for the reasons stated herein, IT IS ORDERED that the value of the livestock retained is $37,766.17; the value of the machinery retained is $26,273.00 and the value of the real property is $307,340.00. IT IS FURTHER ORDERED that the interest rate of 9¾% as proposed in the Debtors' Chapter 12 plan filed July 6, 1987 does not meet the present value requirement of section 1225(a)(5)(B)(ii) and that the appropriate discount rate should be 12%.