In re 222 **LIBERTY ASSOCIATES, Debtor.**

Donald L. **WOLK, Plaintiff,**

v.

**GOLDOME REALTY CREDIT CORP., Defendant.**

**Bankruptcy No. 88–11535S.
Adv. No. 89–0832S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 18, 1989.

As Amended Oct. 23, 1989.

Amending Order Oct. 26, 1989.

Stephen Raslavich, Philadelphia, Pa., for debtor.

Laurence J. Kaiser, Kronish, Lieb, Weiner & Hellman, New York City, for plaintiff/Donald L. Wolk.

Peter Meltzer, Drinker, Biddle & Reath, Philadelphia, Pa., for Goldome Realty Credit Corp.

Andrew N. Schwartz, Philadelphia, Pa., for Creditors' Committee.

Steven B. Mirow, Philadelphia, Pa., for Banks.

Kenneth Carobus, Philadelphia, Pa., for Holt's Cigar.

James J. O'Connell, Asst. U.S. Trustee Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversarial proceeding, seeking that we determine, pursuant to 11 U.S.C. §§ 506(a), (d), the amount of the secured claim of the Defendant, GOLDOME REALTY CREDIT CORP. (hereinafter referred to as "Goldome"), against the sole asset of the Debtor, 222 LIBERTY ASSOCIATES (hereinafter "the Debtor") a building situated at 110–16 South 16th Street, Philadelphia, Pennsylvania (hereinafter "the Building"), must be resolved before the Confirmation Hearing of October 25, 1989, on the Fifth Amended Restated Plan of Reorganization (hereinafter "the Plan") which has been proposed by one of the Debtor's two general partners, Plaintiff DONALD L. WOLK (hereinafter "Wolk"). Since the proposed disposition of the Building pursuant to the Plan does not contemplate its sale on the open market, and proof of any such sale costs except the share of the City and state transfer taxes which the Debtor must pay is not quantified in the record, we decline Wolk's invitation to deduct additional sale costs from the fair market value less the prior tax liens in making the § 506 calculation. However, since we find that Goldome's appraisal overstated the cost of repairs necessary to render the Building satisfactorily rehabilitated by about $1 million, we determine that its fair market value is $4.5 million. We deduct therefrom $300,000, the proximate valid prior real estate tax liens and $78,750, which we calculate to be the Debtor's share of the transfer taxes. We therefore conclude that Goldome's allowed secured claim in the Building, pursuant to § 506 is $4,121,750.

### B. PROCEDURAL HISTORY

Our most comprehensive history of the underlying main case is set forth in an Opinion of May 22, 1989, arising out of litigation surrounding an attempted rescission of an agreement by one Brad Cohen (hereinafter "Cohen") and his corporation to purchase the Building, reported at *In re 222 Liberty Associates*, 99 B.R. 639, 641 (Bankr.E.D.Pa.1989). After the rather mysterious and obviously Wolk-orchestrated amicable resolution of the proceeding in issue there on the eve of trial on August 3, 1989, by Cohen's agreeing to forfeit the $250,000 deposit which he had previously vigorously resisted losing, the tension point of this case has devolved into a question of whether Wolk, who has proposed a series of Plans, could satisfy the demands of Goldome, which had granted a construction loan to the Debtor the balance of which appears to exceed the value of the Building.

Goldome, becoming frustrated with Wolk's efforts, set the present series of events into motion on July 11, 1989, by filing a motion to convert the case to Chapter 7 or dismiss pursuant to 11 U.S.C. § 1112(b) on the ground that neither Wolk nor any other party was likely to propose a confirmable Plan. After several continuances, we scheduled, *inter alia*, this motion, per an Order of August 23, 1989, on a must-be-tried basis on September 6, 1989,

the same date that a hearing on a Third Amended Disclosure Statement accompanying a Fourth Amended Plan of Wolk was held. After an extended colloquy with interested counsel on September 6, 1989, we entered, on the following day, September 7, 1989, what we intended as an order which would determine the final disposition of Wolk's efforts, providing as follows:

1. Certain Objections of Goldome to the Disclosure Statement were sustained, but Wolk was given permission to file a contemplated Fourth Amended Disclosure Statement accompanying a Fifth Amended Plan on or before September 13, 1989, to which Objections were due by September 18, 1989.

2. Wolk was to file the instant § 506 proceeding, which he contended must be resolved before confirmation, on or before September 15, 1989; it was to be answered by October 6, 1989; and it was to be tried on October 11, 1989.

3. The Confirmation hearing on the Plan and the § 1112(b) motion of Goldome, which "[i]n all probability" would be "granted as of course if Wolk's plan cannot be confirmed" were scheduled on October 25, 1989.

Matters have proceeded thereafter as scheduled in the September 7, 1989, Order. The Fourth Amended Disclosure Statement was prepared and approved on September 19, 1989. Voting on the Plan is in progress. This proceeding was tried in one long trial day on October 11, 1989. Given our need to expedite resolution of this matter to meet the deadlines imposed in the September 7, 1989, Order, we were required to request the parties to file post-trial Briefs on October 17, 1989, and then proceed to decide this matter immediately thereafter on the next day. Our Opinion is prepared in narrative form to speed that process.

There are only two factual findings which we must make to resolve this proceeding. The first is the fair market value of the Building. The second is the amount of the prior liens on it. The parties agree that these findings are at least the starting point of the § 506 process. We determine,

as a matter of law in the only significant disputed legal issue, that, except for subtracting the Debtor's share of the transfer taxes, they are the stopping point as well.

## C. THE FAIR MARKET VALUE OF THE BUILDING IS $4.5 MILLION

The touchstone of the valuation process is comparison of two extremely complete and articulate appraisals by two equally-impressively competent appraisers, Louis A. Iatarola (hereinafter "Iatarola") who, hired by Wolk, valued the Building at $4.2 million, and Reaves C. Lukens (hereinafter "Lukens"), hired by Goldome, who valued it at $5.5 million.

Despite the disparity of their bottom-line results, the approach of these two appraisers was so nearly alike that we are compelled to conclude that the proper methodology was stipulated between the parties. Both relied primarily on an income capitalization analysis which yielded almost identical figures for the value of the Building as satisfactorily renovated, $10.2 million (Lukens) and $10.15 million (Iatarola). They then each deducted the cost of repairs, incidental expenses to achieve an acceptable occupancy rate (such as leasing commissions), interest costs, and a margin for entrepreneurial profit.

The main differences are that Iatarola pegged the repair costs at just under $4 million, while Lukens arrived at a figure for such costs at about $3 million. Also, the element of entrepreneurial profit yielded a divergence of over $500,000, as Iatarola set the figure at $870,000, and Lukens opined that $300,000 was quite adequate.

All of the evidence in this record supported the accuracy of the $4 million repairs figure. Iatarola arrived at his figure in light of a detailed evaluation by architect Jay Cohn (hereinafter "Cohn"), who testified in support of his figures. It was developed, in the testimony of Iatarola and Cohn, that Cohn had upgraded earlier estimates of contractor Thomas J. Sullivan (hereinafter "Sullivan"), who had estimated the repairs at approximately $1.4 million. The presence of the Sullivan figures, which

seemingly placed Cohn's figures in question, was turned to Wolk's advantage when Goldome unwittingly called Sullivan as its witness. While adhering to the figures he had submitted, Sullivan testified that (1) He had computed his figures on the basis of completing what repairs had been *started* when he inspected the Building, not performing what repairs he believed was *needed.* He testified that over $400,000 additional repairs were, in his opinion, necessary to adequately rehabilitate the Building; (2) Even more significantly, he testified that his figures had measured the cost of repairing only the general building conditions and not the tenant fit-outs that were needed to lease the building after its total rehabilitation, since it was almost vacant above the street floor. He estimated the cost of tenant fit-outs at $2.2 million. Therefore, Sullivan's measurement of total necessary repair costs coincided almost precisely with Cohn's figure of $4.0 million.[1]

Lukens, meanwhile, arrived at his repair figures without the benefit of any consultant architects or contractors, and he admitted no personal expertise in this area. We are therefore unable to credit his figures, which were rebutted by experts called by Goldome as well as by Wolk.

Both realtors secondarily supported their respective income capitalization calculations with data from comparable sales. However, in making his computations applying this method, Lukens calculated the comparable value of the Building, if satisfactorily renovated, and then again deducted his approximately $3.0 repair figure. Since we conclude that this repair figure is $1 million too low, this calculation similarly is determined by us to be $1 million too low.

We are, however, unwilling to accept Iatarola's bottom line figure, because we found Lukens' testimony regarding the

quantum of appropriate entrepreneurial profit more convincing. We are therefore prepared to accept Lukens' $5.5 million figure, with a downward adjustment of $1 million for under-estimation of necessary repairs. We therefore conclude that the fair market value of the Building, at the crucial period of confirmation, *see, e.g., In re Blakey,* 76 B.R. 465, 468–69, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D. Pa.1987), should be measured at $4.5 million.

### D. $300,000 MUST BE DEDUCTED FROM THE BUILDING TO REFLECT THE PRIOR TAX LIENS AGAINST IT

■ There is no question, in studying the mass of § 506 determinations which have emanated from this court, that any prior liens, such as tax liens, must be deducted from the fair market value in computing the amount of the putative secured creditor's allowed secured claim under the Code section. *See, e.g., In re Mays,* 85 B.R. 955, 964 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4306, 1988 WL 81716 (E.D.Pa. Aug. 1, 1988); *In re Lopez,* 75 B.R. 961, 964 (Bankr.E.D.Pa.1987), *aff'd,* 82 B.R. 712, (E.D.Pa.1988); and *In re Jablonski,* 70 B.R. 381, 384 (Bankr.E.D.Pa.1987), *aff'd,* 88 B.R. 652 (E.D.Pa.1988).

The only prior liens alleged to exist here are real estate tax liens. However, the only evidence which was presented as to the nature and amount of the liens was a certified copy of a computer print-out from the Philadelphia County Prothonotary's office. That document recites tax delinquencies of the Debtor on the Building from 1986 (apparently partial) through 1989, with interest and penalties for each year. The grand total is $444,650.64. With a total abstinence from further analysis, Wolk simplistically argues that the entire sum of $444,650.64 must be deducted from

---

1. This testimony of Sullivan also dispelled an attempt by Goldome to discredit Iatarola on the ground that he had issued a "letter of opinion" valuing the Building at $6 million shortly before issuing his appraisal. Iatarola explained that, in issuing his "letter of opinion," he had relied on Sullivan's $1.4 million estimate as an accurate appraisal of the projected costs on all aspects of the Building. Thus, like Goldome at trial, Iatarola initially erroneously assumed that Sullivan's estimate included all repair costs. This error being thus proven reasonable, no significance can be attached to any discrepancy in the "letter of opinion."

the fair market value of the Building in the § 506 calculation process.

Not having offered any evidence of its own on this issue, Goldome's only retort is to attempt to cast doubt on the conclusivity of this document. It argues, in a point we believe is well-taken, that at least the 1989 taxes accrued post-petition and hence could not serve as a basis for a lien. *See* 53 P.S. § 7102 (local taxes are a first lien on realty only for the year in which the taxes are imposed); and *Equibank v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80, 83 (3d Cir.1989). The taxes, through tax year 1988, total but $280,225.09.

Goldome also questions whether the penalty and interest figures recited on the print-out should be considered because (1) The Plan purportedly does not contemplate paying same, or at least contemplates reducing them, requiring that they be discounted; (2) A "$300,000 five-year exemption from taxes" was purportedly granted to the Debtor and may not have been factored into these figures; and (3) Goldome may be entitled to recourse if it paid the taxes. We have no evidence regarding any five-year exemption, or tax payments by Goldome, therefore requiring us to disregard the second and third of Goldome's contentions. The first contention is, we believe, irrelevant to a § 506 analysis, wherein prior liens are deducted from the fair market value dollar for dollar, without regard to their treatment under the plan. We do find it impossible to ascertain how much of the interest and penalties, totalling $57,441.63, accrued pre-petition and hence constitutes a secured claim pursuant to *Equibank, supra.* We believe that only a portion of the pre–1989 tax year interest and penalties, totalling $46,210.42, accrued pre-petition. In light of the lack of any break-down from Wolk, the party having the burden of proof on this issue, we shall apply a low estimate figure of about $20,-000, and value the total prior real estate tax liens on the Building at $300,000.

Hence, in the first two steps of our § 506 calculation, we shall deduct $300,000 from the $4.5 million fair market value, leaving our calculation, at this point, at the $4.2 million figure.

E. THE ONLY SALE COST WHICH WE DEEM ALLOWABLE, AS APPARENTLY CHARGEABLE TO THE DEBTOR GIVEN THE DISPOSITION OF THE BUILDING IN THE PLAN, IS HALF OF THE LEGAL TRANSFER TAX, OR $78,250

■ The only close issue of law of any real consequence in the disposition of this proceeding is whether any additional deductions should be made from the aforementioned figure of $4.2 million for any of the costs that would be incurred if the Building were sold in the ordinary course on the open market. In order to resolve this issue, it is necessary to carefully analyze 11 U.S.C. § 506(a), which proves as follows:

§ 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest....

There is a split of authority on the question of if and when the costs of sale should be further deducted from the difference between the fair market value of a debtor's secured property and the prior liens against it in making a § 506 calculation. It seems clear that, in the Southern District of Ohio, the rule in making a § 506 calculation has been, since the decision in *In re Paige*, 13 B.R. 713, 714–15 (Bankr.S.D.Ohio 1981), to deduct, from the fair market value less the prior liens, a flat figure of ten

(10%) percent of the fair market value to cover a broker's fee, title insurance, and financing costs which would be incurred by a hypothetical buyer of the property, even where the debtor has no intention of selling the property. *See, e.g., In re Smith,* 92 B.R. 287, 289–91 (Bankr.S.D.Ohio 1988); *In re Boring,* 91 B.R. 791, 794–95 (Bankr.S.D. Ohio 1988); and *In re Richardson,* 82 B.R. 872, 873 (Bankr.S.D.Ohio 1987). Some other courts have agreed. *See, e.g., In re Claeys,* 81 B.R. 985, 990–92 (Bankr.D.N.D. 1987); and *In re Parr,* 30 B.R. 276, 277–78 (Bankr.N.D.Ala.1983). On the other hand, a growing number of courts have rejected this line of reasoning, and have refused to deduct the sale costs in rendering a § 506 calculation unless the debtor's plan contemplates selling the property on the open market. *See, e.g., In re Balbus,* 104 B.R. 767 (Bankr.E.D.Va.1989); *In re Felten,* 95 B.R. 629, 630–31 (Bankr.N.D.Iowa 1988); *In re Bellman Farms, Inc.,* 86 B.R. 1016, 1019 (Bankr.D.S.D.1988); *In re Foster,* 79 B.R. 906, 907–08 (Bankr.D.Mont.1987), *reaff'd,* 84 B.R. 707 (Bankr.D.Mont.1988); *In re Courtright,* 57 B.R. 495, 497 (Bankr.D.Ore. 1986); and *In re Crockett,* 3 B.R. 365, 367 (Bankr.N.D.Ill.1980). A recent decision in even the Southern District of Ohio so holds. *In re Gerhardt,* 88 B.R. 151, 153–54 (Bankr.S.D.Ohio 1987).

We have considered carefully the analyses presented in these cases. The most fully-reasoned of the cases in which calculations including deductions of the respective hypothetical sale costs is made are *Smith, supra,* 92 B.R. at 289–91;[2] and *Claeys, supra,* 81 B.R. at 990–92. Both of these courts believe that a tension between the first sentence and the second sentence of § 506(a). The second sentence, they concede, states that the "purpose of the valuation" and the "proposed disposition or use of such property" is the focal point. They agree that this language appears to focus upon the use which the debtor wishes to make of the property in the reorganization process. However, the fact that the first sentence references "the creditor's in-

terest in the estate's interest in such property" causes these courts to conclude that valuation must be calculated from the vantage point of the creditor and what the creditor's interest would be worth if liquidation were necessary. Sale costs, they reason, would, in liquidation, be deducted from what the creditor would receive for the property.

The cases rejecting the deduction of sale costs, most notably *Gerhardt, supra,* 88 B.R. at 153–54; *Bellman Farms, supra,* 86 B.R. at 1019; and *Courtright, supra,* 57 B.R. at 497, reason that the debtor's intention is the cornerstone of the calculation as reflected in both sentences of § 506(a). The *Balbus* case, taking another tack, relies heavily on dictum in *United Savings Ass'n of Texas v. Timbers of Inwood Forests, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). There, in harmonizing the phrase "value of such entity's interest" in 11 U.S.C. § 361(1) with similar phrases elsewhere in the Code, the Court observes that "[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral,'" without allowances for the creditor's "lost opportunity costs."

The use of § 506(a) in consumer cases in this district has been very widespread, causing many decisions to issue from this court interpreting that Code section in the context of a homeowner who is attempting to minimize a mortgagee's security interest in his home, but is doing so with the overriding intention of saving the home from foreclosure and retaining it as a family residence. *See, e.g., In re Kehm,* 90 B.R. 117, 118–21 (Bankr.E.D.Pa.1988) (TWARDOWSKI, CH. J.); *In re Bender,* 86 B.R. 809, 815–16 (Bankr.E.D.Pa.1988) (FOX, J.); *Mays, supra,* 85 B.R. at 962–64; *Lopez, supra,* 75 B.R. at 961–64; *Jablonski, supra,* 70 B.R. at 384–88; *In re Panas,* 68 B.R. 421, 424–25 (Bankr.E.D.Pa.1986) (GOLDHABER, CH. J.); *In re Whitener,* 63 B.R. 701, 701–02 (Bankr.E.D.Pa.1986) (GOLDHABER, CH. J.); and *In re Savloff,*

---

**2.** The *Smith* case goes on to also deduct the debtor's personal exemptions from the fair market value in making the § 506 calculation, 92

B.R. at 291–93. We do not agree with the propriety of this procedure, for reasons described at page 804 n. 3 *infra.*

4 B.R. 285, 286–88 (Bankr.E.D.Pa.1980) (GOLDHABER, CH. J.). In all of those cases, the various judges of this court calculated the secured claims of undersecured creditors by deducting *only* the prior liens from what the court found to be the fair market value of the property. The notion of deducting sale costs from the net figure obtained was never considered, nor apparently ever raised, in any of these cases.

In *Mays, supra;* and *Lopez, supra,* this court analyzed in some detail the aspect of valuation of the properties of the respective debtor in which their respective mortgagees claimed security interests. In *Mays,* in making the § 506 calculation, we found that the debtor's intention to remain in her home prevented her from deducting, as an allegedly prior lien, the amount of a lien which would be removed only on the condition that she continued to reside in the property. In *Lopez,* we rejected a mortgagee's contention that we should measure its interest by the value of what it would receive as a premium under federal mortgage insurance if the debtor's home were foreclosed. We emphasized that the proper valuation should relate to the fair market value of the home, since it was the debtor's intention to use it and not allow it to be subject to foreclosure.

These analyses suggest that emphasis should be placed upon the debtor's proposed disposition and use of the property in the § 506 valuation process, as the second sentence of § 506(a) expressly dictates. Moreover, we disagree with the suggestion made in the *Smith* and *Claeys* cases that there is an inconsistency or at least a tension between the thrust of the first sentence of § 506(a) and the second sentence of § 506(a). The first sentence requires that the court value the creditor's interest *in the estate's interest* in the secured property. Thus, the creditor's interest can be ascertained only after the estate's interest is ascertained. As the second sentence dictates, the estate's interest must be measured in light of the disposition and use of the property articulated in the debtor's plan (or, in a Chapter 7 case like *Mays,* in accordance with the debtor's expressed intended future use of the property). Therefore, if the debtor plans to retain the property valued under § 506(a), we do not believe that it is property to factor in hypothetical sale costs.[3]

This conclusion does not totally resolve the issue of whether sale costs should be deducted in a § 506 calculation in any particular case, and this case in particular. The determinative factor is what the proposed plan of reorganization anticipates will be the disposition or use of the property valued under § 506 under the terms of the plan. Therefore, we must carefully analyze Wolk's current Plan, the confirmation of which is part of the subject matter of hearings on October 25, 1989.

The Plan provides that Wolk will fund it, by paying most classes of creditors forty (40%) percent of their claims on the effective date and the other sixty (60%) percent in ten annual installments, in exchange for the transfer of the Building to him or his designee.[4] Therefore, what is proposed is a transfer of title of the Building which has some of the characteristics of a sale. There will be a transfer, contemplating payment of transfer taxes. However, there will be no marketing of the Building, precluding the expenditure of real estate sales commissions. Given such a proposed disposition of the Debtor's property, it seems clear that the portion of the transfer tax payable by the Debtor should be deducted in the § 506 calculation process, but no other sale costs, and certainly not the ten (10%) percent figure which might be

---

3. We also believe that the *Smith* court errs in deducting the debtor's personal exemptions in this calculation. Property which is exempt is nevertheless property of the debtor's estate. *See* 11 U.S.C. § 541(a). It is the entire interest of the debtor's estate in the property which should be considered in a § 506 determination.

4. Alternative treatment of Goldome's claim is proposed. If it accepts the Plan, Goldome will receive payment of $4 million as a secured claim, and a balance of $3 million in, roughly, ten annual installments. If it rejects the Plan, Goldome shall receive only its allowed secured claim pursuant to § 506. It is this contingency which rendered this proceeding necessary.

deducted were this § 506 valuation occurring in the Southern District of Ohio.

We further observe that, on the record here, Wolk presented evidence regarding only the imposition of a transfer tax. Although there was some vague testimony as to the normal real estate broker's commissions charged in the City, it was not related to sale of large properties like the Building in issue. No witness was asked straight out the basic and we believe necessary question to meet Wolk's burden on this point, *i.e.*, what the commission for selling this Building on the open market would be.

We find that the Debtor's share of the transfer taxes should be considered in the instant § 506 calculus, as this is an expense which we believe that the Debtor will be obliged to pay if the transfer of the Building proceeds as the Plan proposes. The state transfer tax rate is indisputably one (1%) percent of the value of the property transferred. 72 P.S. § 8102–C. In 1988, the City of Philadelphia purported to raise the additional local transfer tax from two and a half (2½%) percent, PHILA. CODE, § 19–1404(1), to over four (4%) percent. *See City of Philadelphia v. Weiner*, 121 Pa.Cmwlth. 139, 550 A.2d 274, 275–76 (1988). However, the Philadelphia Court of Common Pleas preliminarily enjoined the attempted transfer tax increment because it was enacted in violation of the City Charter. *Id.* 550 A.2d at 276. This injunction was unanimously affirmed by the Commonwealth Court, sitting en banc. *Id.* at 275, 278–79. Therefore, it is apparent that the present *valid* total transfer tax rate for properties in the City of Philadelphia is three and a half (3½%) percent.

Mr. Lukens testified, without rebuttal, that half of the transfer tax is traditionally borne by the seller and half by the buyer in Philadelphia. Therefore, the Debtor can anticipate a transfer tax liability of one and three-quarters (1¾%) percent in the transfer of the Building contemplated in the Plan. Thus, the anticipated transfer tax liability which we shall deduct from the $4.2 million figure previously attended is 1.75 percent of the $4.5 million fair market value, or $78,750. This is the only deduc-tion from the $4.2 million towards sale costs which is proven allowable here given Wolk's proposed distribution of the Building.

The allowed claim of Goldome, under § 506, is therefore $4.2 million less $78,750, or $4,121,250.00

## F. CONCLUSION

We will enter an Order valuing Goldome's valid secured claim in the Debtor's Building in the amount of $4,121,250.00.

## ORDER

AND NOW, this 18th day of October, 1989, after trial of this matter on October 11, 1989, and consideration of the parties' post-petition submissions, it is hereby ORDERED as follows:

1. Judgment is entered in part in favor of the Plaintiff, DONALD L. WOLK, and against the Defendant, GOLDOME REALTY CREDIT CORP.

2. The value of the Defendant's interest in the interest of the Debtor, 222 LIBERTY ASSOCIATES, in its building located at 110–16 South 16th Street, Philadelphia, Pennsylvania 19103, is determined to be $4,121,250.00.

## ORDER AMENDING ORDER OF OCTOBER 18, 1989

AND NOW, this 26th day of October, 1989, upon consideration of the Motion of the Defendant, GOLDOME REALTY CREDIT CORP. (hereinafter "Goldome"), to amend the Judgment entered in this proceeding on October 18, 1989, it is ORDERED as follows:

1. The Motion is GRANTED in part.

2. The Order of this Court dated October 18, 1989, as amended on October 23, 1989, is further amended to fix the interest of Goldome in the Debtor's estate at $4,200,000.

We find that Goldome is correct in its assertion that the anticipated transfer tax of $78,750 should not be deducted in the § 506 calculation here, because Wolk's Plan does not contemplate paying these

taxes in the planned transfer and these taxes may not be payable by operation of 11 U.S.C. § 1146(c). However, we reject Goldome's further contention that we erred by failing to apply a discount rate to the $1 million shortfall in repair costs which we found that Lukens applied in making his appraisal. Our statement that we were "prepared to accept," at 801, Lukens' $4.5 million figure and then reduce it by $1 million was not meant to convey the impression that we considered Lukens' appraisal to be, in all respects, other than the repair estimate, more accurate than the appraisal of Iatarola. Rather, we merely meant that we were comfortable with the $4.5 million figure as accurate, which happened to be $1 million less than Lukens' appraisal figure. We note that, although we found no component of Iatarola's appraisal to be so clearly in error as Lukens' repair estimate, we also declined to accept Iatarola's figure of $4.2 million.