In re Ralph and Dorothy OVERHOLT, Debtors–Appellants.

Ralph and Dorothy OVERHOLT, Appellants,

v.

FARM CREDIT SERVICES, Appellee.

No. C–2–89–0589.

United States District Court, S.D. Ohio, E.D.

Dec. 11, 1990.

Charles Ewing, Columbus, Ohio, for debtors-appellants.

Frank Pease, Worthington, Ohio, Chapter 12 Trustee.

William Logan, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, Ohio, for Farm Credit Services.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the appeal of Ralph and Dorothy Overholt from an order of the United States Bankruptcy Court for the Southern District of Ohio. District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges. 28 U.S.C. § 158(a) (1988); Bankr.R. 8001.

This appeal requires the Court to consider the impact of Chapter 12[1] of the Bankruptcy Code on the Farm Credit Act of 1971[2] and the Agricultural Credit Act of 1987.[3]

The Overholts filed for bankruptcy under Chapter 12 on December 30, 1988. They submitted a Chapter 12 plan on March 30, 1989, to which the Land Bank objected. After an additional amended plan, the court below issued an order confirming the debtors' "Second Amended Chapter 12 Plan" ("the Plan") on June 5, 1989. The court confirmed the Plan subject to several crucial conditions, the subject of which are at the core of this appeal. The debtors filed the instant action on October 1, 1987.

First, the Plan would be confirmed only if the debtors made payments to the secured creditors through the trustee's office. Second, the court confirmed the plan with the condition that the Federal Land Bank's allowed secured claim would not be reduced by the hypothetical cost of liquidating the collateral. Finally, the bankruptcy court required the debtors to retain possession of the stock in the Land Bank which they were required to purchase at the time they initiated their loan. The Plan had provided for the debtors to surrender the stock to the Land Bank and for a setoff of the $10,000 value of the stock from the amount of the Land Bank's allowed secured claim.[4] The final issue on appeal, then, is whether the bankruptcy court erred in requiring the Overholts to retain this stock.

## I. DIRECT PAYMENT AND TRUSTEE COMPENSATION

The first issue before the Court is whether the debtors may pay impaired claims directly to their creditors, thus avoiding payment of the statutorily mandated percentage fees otherwise due the trustee. Resolution of this issue will require deter-

mination of three questions. First, can a debtor make direct payments to a creditor at all? Second, if direct payments are allowed, may impaired claims also be paid directly? Finally, if an impaired claim can be paid directly, is the trustee entitled to a percentage fee for the amount of the debt which was paid directly to the creditor?

### A. Textual Analysis

1. Direct Payment of Secured Claims

■ Resolution of the first issue begins with close analysis of the statutory language itself. Three statutory sections are relevant to this inquiry. First, section 1225(a)(5)(B)(ii) provides:

(a) Except as provided in subsection (b), the court shall confirm the plan if—

. . . . .

(5) with respect to each allowed secured claim provided for by the plan—

. . . . .

(B)(ii) the value, as of the effective date of the plan, of property to be distributed by the *trustee or the debtor* under the plan on account of such claim is not less than the allowed amount of such claim.

11 U.S.C. § 1225(a)(5)(B)(ii) (1988) (emphasis added). The plain language of this section makes a provision for payment of secured claims by either the trustee or the debtor. The use of the word "shall" in subsection (a) indicates that Congress meant to direct mandatory confirmation of Chapter 12 reorganization plans if any of the three alternative scenarios presented in subsections (A), (B), or (C) were satisfied. Further, by excepting from the constraints of subsection (a) the provisions of subsection (b), which deals with unsecured claims, Congress has suggested that mandatory confirmation of direct debtor payment is available only with respect to secured

---

1. 11 U.S.C. §§ 1201–1231 (1988). Congress enacted the provisions of Chapter 12 in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986. Pub.L. No. 99–554, 100 Stat. 3088.

2. 12 U.S.C. §§ 2001 et seq. (1988).

3. Pub.L. No. 100–233, 101 Stat. 1568 (1988).

4. For an explanation of the possible motives governing the parties' arguments, see *In re Shannon,* 100 B.R. 913, 915 n. 4 (S.D.Ohio 1989).

claims. Thus, subsection (a) removes court discretion with respect to plans authorizing direct payment of secured claims under the circumstances there delineated. Therefore, it can safely be said that while payment through a trustee may be the typical, and indeed the preferred method of payment,[5] such a distribution method is not always required.

An examination of the analogous provision in Chapter 13 is also instructive, for it has been recognized that although Chapter 12 addressed specifically the problems of the family farmer, it incorporated many of the concepts and provisions found in other chapters of the bankruptcy code, especially Chapter 13. *Matter of Finkbine*, 94 B.R. 461, 464 (Bankr.S.D.Ohio 1988). Section 1325(a)(5)(B)(ii) of Title 11 of the United States Code, the Chapter 13 analogue, is identical to the Chapter 12 provision, except that the Chapter 12 provision contains the phrase "by the trustee or the debtor." 11 U.S.C. § 1225(a)(5)(B)(ii) (1988). The addition of the new language in Chapter 12 would appear to be indicative of Congressional approval of direct payment by debtor-farmers to their secured creditors, thus reflecting a significant broadening of past Chapter 13 practices.

■ The discrepancy in the above language, in light of the otherwise manifold similarities between Chapters 12 and 13, is especially noteworthy given Congress's presumed familiarity with traditional bankruptcy practice and the relative success of the system. When a Chapter 12 provision has a different wording than its Chapter 13 counterpart, the otherwise numerous similarities preclude the inference that such discrepancies arose due to inadvertence, passage of time, the thoroughly dissimilar natures of the two chapters, or the like. To the contrary, the Court is duty-bound to presume that the differences were intentional, and were meant to implement the very policy concerns that prompted passage of the bill in the first place. Moreover, the conferees responsible for drafting the legislation had within their ranks experts in the field of bankruptcy who are entitled to a high presumption of competence in the intricacies of bankruptcy law and practice.[6] For this reason, the Court is persuaded that the Congress which enacted Chapter 12 was well aware of the language in Chapter 13, and implemented it in order to effectuate the specific changes needed to accommodate the exigencies of the situation then at hand. Surely Congress would not have changed statutory language, so well established and understood by the bankruptcy courts and predictable in execution, unless they had intended for there to be a departure from past practice. The Court concludes that section 1225 authorizes direct debtor payment of all secured claims to the extent that they are in compliance with the requisites of sections 1225(a)(5)(A)–(C).

The second statutory section relevant to this inquiry is section 1226(c), which provides: "Except as otherwise provided in the plan or order confirming the plan, the trustee shall make payments to the creditor under the plan." 11 U.S.C. § 1226(c) (1988). The phrase "except as otherwise provided" shows clearly that the trustee is not the only party intended to make distributions under the reorganization plan. Taken in context with section 1225(a)(5)(B)(ii), it is apparent that the farmer-debtor is the other party to whom the statute refers. Although the statute may impliedly express a preference or expectation that a trustee is the usual party to make such distributions, there can be no question that the statute appears to have had within its contemplation direct payments by the debtor.

The final segment of text which bears on the immediate issue of whether the debtor may pay the creditors directly is section 1222(b)(9). Under this section, the plan

---

5. *See* 11 U.S.C. § 1226(c) and discussion *infra* p. 205.

6. For example, Bankruptcy Judges A. Thomas Small and Thomas Moore of the Eastern District of North Carolina acted in an advisory capacity during the drafting of Chapter 12. *See* 132 Cong.Rec. S15076 (1986), *reprinted in* L. King, App. 4 *Collier on Bankruptcy* at XXII–17 (remarks of Sen. Grassley) (hereinafter App. 4 *Collier on Bankruptcy*).

may "provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title, over a period exceeding the [three year] period permitted under section 1222(c)." 11 U.S.C. § 1222(b)(9) (1988).

"While payments on secured claims are typically made over a three year period, and may be made over a period of up to five years, payments on secured claims can be made over vastly longer periods of time."[7] In addition, "the trustee will be dismissed after the debtor has completed making all payments with regard to unsecured claims."[8] Therefore, "the trustee will not be available to make payment on secured claims after the plan period, and the debtor will have to make those payments directly."[9]

Given the procedures established by sections 1222(b)(9) and 1228(e), that the court will dismiss the trustee after payment of the unsecured claims and the debtor will have to make payments on secured claims anyway, two readings of the statute are possible. One possibility is that the statute requires all payments on secured claims to be made through the trustee during the trustee's term and thereafter the debtor may pay the secured claims directly. The other possibility is that the debtor can pay the creditors directly throughout the payment period provided for in the plan.

Nowhere does the plain language of sections 1222(b)(9) and 1228(e) expressly mandate a two-stage process in the payment of secured claims, one through the trustee and the other direct, as posited in the first possibility above. By contrast, these statutes are entirely consistent with direct payments to the creditors throughout the repayment period, as suggested in the second possibility. This text, therefore, provides evidence that Congress intended to allow debtors to make direct payments from the effective date of the plan.[10] In sum, three statutes bear on the issue of direct payments to creditors: sections 1225(a)(5)(B)(ii), 1226(c), and 1222(b)(9). At a minimum, when taken together, these statutes permit direct payments from the debtors to the secured creditors starting from the effective date of the reorganization plan.

### 2. Direct Payment of Impaired Claims

■ The next item for resolution, then, is the question whether impaired claims may also be paid directly to creditors by debtors. Once again, the statute itself is controlling. Other than the provisions of sections 1225(a)(1), (a)(3), and (a)(4), there is no other affirmative limitation on the types of claims a bankruptcy court may allow a debtor to pay directly. Nowhere does the statute foreclose direct payment of impaired claims. Moreover, an impaired claim remains a secured claim, to the extent of the fair market value of the collateral, though concededly it is less than the amount of the original obligation. Although the amount of the claim exceeding the judicially modified sum is unsecured, the balance nevertheless retains it secured status. Consequently, direct payment of impaired claims appears to be permissible under the language of Chapter 12.

### 3. Trustees' Fees

■ The final question for resolution of the first issue of this appeal is whether the trustee is entitled to a percentage fee of those monies paid directly by the debtor. The statute relevant to the Court's inquiry here is section 586(e) of Title 28 of the United States Code, which determines the method and amount of the standing trustee's compensation. 28 U.S.C. § 586(e) (1988). This section is important because the ultimate issue in this portion of the

---

7. 5 C. Cyr, H. Minkel, R. Rogers, H. Sommer, W. Taggert & A. Winkler, *Collier on Bankruptcy*, ¶ 1226.01, at 1226–4 (15th ed. 1989) [hereinafter 5 *Collier on Bankruptcy*].

8. *Id.; see* 11 U.S.C. § 1228(e) (1988).

9. 5 *Collier on Bankruptcy, supra* note 7, ¶ 1226.01, at 1226–4.

10. *Cf.* 5 *Collier on Bankruptcy, supra* note 7, at ¶ 1226.01, at 1226–4 ("Rather than have the debtor substitute for the trustee after the trustee's dismissal, it makes more sense for the debtor to make such payments directly from the outset.").

appeal is whether the debtor may avoid paying the trustee. Section 586(e)(2) provides:

> Such individual [the trustee] shall collect such percentage fee from all payments *received by such individual* under plans in the cases under chapter 12 or 13.

The language "received by such individual" would appear to mean that the trustee is entitled to compensation based upon a percentage only of those monies he actually receives. Absent from the statutory language is any indication that Congress meant to incorporate notions of constructive possession or other methods of calculating the percentage amounts. Had that object been intended, Congress could have said "payments received or that could have been received," or "payments made by the debtor or creditor under the plan," or some similar variation. Instead, Congress chose language that is instructive in its simplicity and unmistakable in its meaning: only actual receipt of the payments will confer upon the trustee a right to compensation.

Further, the passage strongly suggests that there will be instances in which the trustee will not receive monies which are nevertheless paid to the creditors. Obviously, if the creditors are to receive their money, and it is not coming from the trustee, it must be coming from someone. That source, in the context of the above statutes, must be the farmer-debtor himself. Therefore, the plain language of the statute directs that the trustee in Chapter 12 reorganizations is entitled to a percentage fee only to the extent he actually receives the monies prior to disbursement. Thus, direct payments by debtors are not subject to the trustee's fee. Moreover, there is nothing in the language of the statute itself to suggest that a different result should obtain in the case of direct payments of modified claims. Consequently, this Court concludes that the statutory language supports the argument that direct payment of modified claims is likewise exempt from the trustee's fee.

### B. *Legislative History*

Having interpreted these statutes facially, the focus of the inquiry now shifts to determine whether the legislative history of Chapter 12 serves the same result. At the outset, it should be noted that the recorded entries are scant indeed, and provide only limited information from which to arrive at conclusions as to Congressional intent. Nonetheless, given the admitted ambiguity surrounding the disputed code sections, some useful information can be gleaned from the legislative history of the act.

Chapter 12 was enacted as an extraordinary response to a temporary situation in which family farmers were faced with economic annihilation brought about by the crippling combination of rising production costs, falling land values, and falling consumer prices. Passage of Chapter 12 manifested Congressional recognition that

> [m]ost family farmers have too much debt to qualify as debtors under Chapter 13 and are thus limited to relief under Chapter 11. Unfortunately, family farmers have found Chapter 11 needlessly complicated, unduly time consuming, inordinately expensive and, in too many cases, unworkable.... [Chapter 12] is designed to give family farmers ... a fighting chance to reorganize their debts and keep their land. It offers family farmers the important protection from creditors that bankruptcy provides while, at the same time, ... ensuring that farm lenders receive a fair payment.[11]

This statement, and others like it, indicate that the Congressional sponsors of the bill were motivated as much by the rights of creditors in the affected areas as by the needs of the farmers themselves. The statement of Representative Hamilton Fish of New York is illustrative:

> A new chapter 12 for family farmers ... is tailored specifically to the realities of a nationwide farm crisis. Conscious of the needs of farm lenders, the conferees at-

---

11. 132 *Cong. Rec.* H8986–9002 (daily ed. Oct. 2, 1986), *reprinted in* App. 4 *Collier on Bankruptcy, supra* note 6, at XXII–5. *See also* H.R.Rep. No. 764, 99th Cong., 2d Sess. 48 (1986), *reprinted in* 1986 *U.S.Code Cong. & Admin. News* 5227, 5249.

tempted to include provisions that are fair to both creditors and debtors.[12]

The fear which prompted the protection of creditors' rights in the bill was that the collapse of the farm industry would affect not just farmers and consumers, but could also create a possible domino effect in all the agricultural support industries so vital to the nation's infrastructure. Thus, not only were farmer-debtors and their creditors at risk, but the communities in which they lived as well. Such a collapse would have potentially catastrophic consequences, or so Congress apparently believed. Representative Mike Synar of Oklahoma observed

> that not only are ... farmers going to be winners by this legislation, but creditors who would see that they would only be able to get 10 cents on the dollar are going to be winners, and also those family farmers who surround those other farmers are going to be winners because we will not have that collapsing or domino effect from the equity of other farms going down when fellow farmers go bankrupt.[13]

The purpose was to "maintain the balance in the farm communities between suppliers, creditors, and farmers." [14] In sum, the recurring theme in the floor statements of the sponsors of the legislation was "that creditors should not shoulder all the burden of the farm crisis and that creditors are at risk as well." [15] Indeed, at least one Senator who was critical of Chapter 12 felt that it did not go far enough to protect creditors, warning that the farming community could use unfairly some of the provisions of the bill to deprive creditors of "participating in an upswing in the value of its collateral." [16]

It is striking, given the importance of this legislation, that there exists little discussion about the substantive provisions of Chapter 12. Instead, Congressional leaders focused on the broader purposes for the bill and the wide scope of relief they felt it would provide to the targeted beneficiaries. Although there is no direct discussion of the operation of the statutes here at issue, certain inferences may be drawn which tend to support the conclusion drawn by this Court on the basis of its examination of the plain language of the statute.

If the purpose of the statute was to provide an inexpensive and less complex alternative to Chapter 11 filings, then allowance of direct payments by the debtor to the creditors in some circumstances would serve this end. It would be less expensive because a greater percentage of the debtor's money would go directly to the creditor. The aggregate amount of the trustee's fee would be reduced, perhaps by a substantial amount, thus reducing the cost of reorganization to the debtor. Moreover, creditors would receive payment on their loans more expeditiously since less would be siphoned off in trustees' fees. Because the creditors would receive full payment sooner, they would pay less for the debtor's insolvency since they would have the benefit of the time value of money from the accelerated repayment. Finally, the total expense to the community would be less since the cost of borrowing money and the ease of obtaining credit, generally determined by market realities, would be lowered to reflect the improved collection rate of prior loans by the local banks. From the foregoing analysis, it can readily be seen how the provision for direct payment can reduce the costs of reorganization. The legislative history of Chapter 12, then, supports this Court's interpretation of the statutes.

12. 132 *Cong. Rec.* H8986–9002 (daily ed. Oct. 2, 1986), *reprinted in* App. 4 *Collier on Bankruptcy, supra* note 6, at XXII–10.

13. *Id.* at XXII–11.

14. 132 *Cong. Rec.* S15075 (daily ed. Oct. 3, 1986) (remarks of Sen. Thurmond), *reprinted in* App. 4 *Collier on Bankruptcy, supra* note 6, at XXII–15.

15. 132 *Cong.Rec.* S15074–15094 (daily ed. Oct. 3 1986), *reprinted in* App. 4 *Collier on Bankruptcy, supra* note 6, at XXII–15. *See also id.* at XXII–62 (statement of Sen. Hatch).

16. 132 *Cong.Rec.* S15074–15094 (daily ed. Oct. 3, 1986), *reprinted in* App. 4 *Collier on Bankruptcy, supra* note 6, at XXII–61 (statements of Sen. DeConcini).

## C. *Precedent*

The Court now looks to relevant case law to determine whether the conclusions drawn thus far enjoy any judicial support. Unfortunately, neither the United States Supreme Court or the Court of Appeals for the Sixth Circuit have addressed the direct payment issue. Accordingly, the Court turns to decisions from other jurisdictions and bankruptcy courts to determine the degree to which the foregoing conclusions are supportable.

The various courts which have addressed this issue have reached conflicting results. Essentially two lines of cases have developed. In the first line, courts have either prohibited direct payments, *In re Citrowske*, 72 B.R. 613 (Bankr.D.Minn.1987), allowed the debtor only to make direct payments to secured creditors, *In re Mouser*, 99 B.R. 803 (Bankr.S.D.Ohio 1989); *Matter of Finkbine*, 94 B.R. 461 (Bankr.S.D.Ohio 1988); *Matter of Sutton*, 91 B.R. 184 (Bankr.M.D.Ga.1988); *In re Hildebrant*, 79 B.R. 427 (Bankr.D.Minn.1987); *In re Hagensick*, 73 B.R. 710 (Bankr.Iowa 1987), or, even if direct payments were allowed, have mandated that the payments were nevertheless subject to the trustee's statutory percentage fee, *In re Cannon*, 93 B.R. 746 (Bankr.N.D.Fla.1988); *In re Logemann*, 88 B.R. 938 (Bankr.S.D.Iowa 1988); *In re Greseth*, 78 B.R. 936 (D.Minn.1987). In all of these cases, the overriding concern was that to allow direct payments in all but the most exceptional of circumstances would undermine the viability and integrity of the trustee system. This proposition was most cogently defended by the court in *In re Mouser*, where the judge noted that

> [t]he Court finds that the trustee is charged with significant responsibility relating to the progress and success of a Chapter 12 plan.... This Court believes it unduly complicates the trustee's ability to supervise and monitor the plan if the debtors make payments under the plan

on prepetition obligations or administrative claims, including those ... which are either modified by the plan or not intended to survive the conclusion of the plan. Essentially, plans with such provisions give the trustee responsibility without the power to accomplish the associated duties or the control necessary to administer the plan properly. In addition, practically, a debtor's ability to successfully complete a confirmed plan is decreased if most or all of the payments are to be made without the supervision or intervention of the trustee.

*In re Mouser*, 99 B.R. at 806. The authority for this case, and indeed for most cases in accord, lies in the individual courts' experience with the practical necessities of bankruptcy practice as well as their analogous treatment of similar cases under the provisions of Chapter 13. The arguments, born of the wisdom of experience, are compelling indeed.

By contrast, other courts have found that direct debtor payment of both secured and modified claims are allowed by Chapter 12. *Matter of Pianowski*, 92 B.R. 225 (Bankr.W.D.Mich.1988); *In re Crum*, 85 B.R. 878 (Bankr.N.D.Fla.1988); *In re Land*, 82 B.R. 572 (Bankr.D.Colo.1988); *In re Erickson Partnership*, 77 B.R. 738 (Bankr.D.S.D.1987), *aff'd*, 83 B.R. 725 (D.S. D.1988). These cases relied principally on *In re Erickson Partnership*, 77 B.R. 738 (Bankr.D.S.D.1979) for its application of Chapter 13 principals to this question. The *Erickson* court, citing *In re Tatum*, 1 B.R. 445 (Bankr.S.D.Ohio 1979), applied the Chapter 13 "fairness test" to a Chapter 12 reorganization.[17] Essentially a tripartite inquiry, the court looked to sections 1222(a)(3), (b)(1), and 1225(a)(3) to determine the proposed plan's conformity to the statutory mandate. First, under section 1222(a)(3), the court found that the impaired creditor had exercised its statutory option to agree to less favorable treatment

---

17. The fairness test in Chapter 13 cases is applied in those instances where a debtor proposes to classify claims for repayment purposes. Before a court will approve such a plan, it must first inquire as to the equity of treatment among the respective creditors. If all similarly situated creditors are treated equally, the fairness test will have been satisfied. *See In re Tatum*, 1 B.R. 445, 446 (Bankr.S.D.Ohio 1979); *see also In re Blevins*, 1 B.R. 442, 444 (Bankr.S.D.Ohio 1979).

than other similarly situated creditors. *Erickson,* 77 B.R. at 748. Next, the question was whether the proposed direct payment would unfairly discriminate against unsecured creditors in contravention of section 1222(b)(1). Because the debtors agreed to pay the creditor the fair market value of its secured claim, no discrimination was found. *Id.* Finally, the court concluded that the existence of a self-monitor and remedy system evinced the good faith required for approval under section 1225(a)(3). *Id. Erickson* and its progeny found the competing policy concerns of farmer-creditor rights to outweigh the rights of trustees to a mandatory fee, notwithstanding the importance of the office of the trustee. These cases rejected a bright line approach, opting instead for a case-by-case analysis to consideration of direct payments, relying heavily on the discretion of the individual bankruptcy courts to monitor those debtors they felt were good candidates for direct payments.

### D. *Analysis*

After careful review of the statutes, the legislative history, and the existing case law, this Court concludes that sections 1225 and 586, when taken together, allow for direct payment of modified claims to creditors without payment to the trustee of the percentage fees. Critical to this conclusion is the Court's interpretation of section 586. As demonstrated above, section 586 requires that the trustee actually receive the funds to be distributed to the creditors before he is entitled to receive a percentage of the total. It follows, then, that when payments are made directly by the debtor, the trustee is bypassed and never receives those monies. Hence, he is not entitled to a share.

The trustee in this case, and the cases which have reached contrary conclusions, argues that impaired claims are those for which the courts have judicially altered the rights of the creditor, and by so doing have placed the payments under the reorganization plan. The trustee relies on several cases which have held that "modified" claims were claims that were "under the plan," and were thus subject to the statu-

tory fees. *See In re Hildebrandt,* 79 B.R. 427, 428–29 (Bankr.D.Minn.1987); *In re Hagensick,* 73 B.R. 710, 714 (Bankr.N.D. Iowa 1987); *In re Citrowske,* 72 B.R. 613, 615–16 (Bankr.D.Minn.1987). But examination of these cases reveals that they are inapposite to the present controversy, yielding little of value upon which to base any conclusion as to the correct interpretation of the disputed statutes.

For example, the court in *In re Citrowske,* while purporting to construe section 586(e), never mentioned that section 586(e) contained a change in statutory language from section 1202(a), and concluded simply that "the trustee collects the specified percentage fee from payments under the plan." *Citrowske,* 72 B.R. at 615. The court's failure to indicate that it was even aware of the difference between sections 1202 and 586, and its reliance on the "under the plan/outside the plan" analysis, suggest that the court was either unaware of the difference or chose to ignore it. Similarly, in *In re Hagensick,* the court relied exclusively on Chapter 13 and cases construing it, thus suggesting that section 1302 was analogous to section 1202. *Hagensick,* 73 B.R. at 710. Because this case relied exclusively on section 1202, the court did not even consider section 586. For this reason, the case fails utterly to inform the Court's inquiry in the present dispute. Finally, in *In re Hildebrandt,* the court based its decision upon "[c]ertain case law under Chapter 13" which allowed payment outside the plan where claims were not modified. *Hildebrandt,* 79 B.R. at 428. In addition to its failure to distinguish between sections 1202 and 586, the case did not even deal with impaired claims. It is completely inapposite to this case.

Other cases upon which the trustee relies suffer a similar flaw. The court in *In re Greseth,* 78 B.R. 936 (D.Minn.1987), relied on a Chapter 13 case, *In re Foster,* 670 F.2d 478 (5th Cir.1982), and never acknowledged the distinction in the relevant code sections. *Id.* at 940. Furthermore, this case did not deal with an impaired claim since the tax payments at issue were not modified. *Id.* Thus, even if the case did

shed some light on the statutes now before the Court, it did not address the question of direct payment of impaired claims. Finally, in *Matter of Sutton*, 91 B.R. 184 (Bankr. M.D.Ga.1988), the court simply adopted *In re Logemann* without discussion. There is nothing of substance otherwise to guide this Court. The above cases, it is clear, do not advance the trustee's position.

■ Common to all of the above cases, and to the rest of the cases cited by the trustee, is their reliance on the "under the plan" and "outside the plan" dichotomy. Yet this terminology is a derivative of section 1202 case law which is itself shaped by the contours of section 1302 and cases such as *In re Foster*, 670 F.2d 478 (5th Cir.1982). Section 586, however, replaced those two provisions, and contained no reference to payments made "under the plan." 28 U.S.C. § 586(e). Thus it is clear that sections 1202, 1302, and *In re Foster* and its progeny have been statutorily overruled by section 586. *In re Wright*, 82 B.R. 422, 423 (Bankr. W.D.Va.1988). Consequently, the "under the plan/outside the plan" distinction is no longer meaningful, if indeed it ever was. Instead, the critical issue now is whether the trustee receives payment, and if not, no fee can be assessed. This conclusion is buttressed by those commentators who suggest that the plethora of cases holding to the contrary have failed adequately to account for the statutory language in section 586, and that as a consequence, the cases were mistaken.[18] Therefore, the Court holds that direct payment of impaired claims is permissible, and that such payments are not subject to the trustee's fee.

As a practical matter, the Court's conclusion obtains for another reason. The typical Chapter 12 debtor is different than a Chapter 13 debtor. First, they tend to have a relatively high amount of secured debt, but relatively few creditors in comparison with Chapter 13 debtors. *In re Mouser*, 99 B.R. 803, 805 (Bankr.S.D.Ohio 1989). More important, a Chapter 12 debt-

or's income is derived primarily from their crops. Because such income is received only two or three times during the calendar year, rather than weekly or bi-weekly, the trustee simply has less to supervise on an ongoing basis. To permit routine assessments may, in some cases, create a needless windfall for the trustee, and create added expense for the debtor.

■ Having reached the conclusion that direct payments by the debtor are permissible, the question now is under what circumstances should such an arrangement occur. The code and the cases examined herein identify two distinct situations which require somewhat different treatment. First is the case of direct payment of secured claims. Here, the code indicates that although direct payments are not a matter left to the sole discretion of the debtor, neither are they a matter left to the discretion of the court. This is because confirmation of the plan, which may include direct payments, is mandatory upon satisfaction of the statutory requirements of section 1225.[19] For example, section 1225 directs that "the court *shall* confirm the plan if" each of six conditions is met. 11 U.S.C. § 1225(a) (emphasis added). Section 1225 then identifies several preliminary conditions to be satisfied before confirmation must be authorized by the court. The plan must comply with the requirements of Chapter 12 as well as the applicable provisions of Title 11, all fees required under Chapter 123 of Title 28 must be paid, the plan must be proposed in good faith, and the value of the property of each unsecured claim to be distributed under the plan must not be less than that allowable under Chapter 7. 11 U.S.C. §§ 1225(a)(1)–(3). Moreover, confirmation requires that the secured creditor either approve the plan, retain the lien securing the claim (if the value of the property is not less than the allowed amount of the claim), or retain the property itself. Finally, the court must be satisfied that the debtor is capable of maintaining compliance with the plan. 11 U.S.C.

---

**18.** *See* 5 *Collier on Bankruptcy, supra* note 7, ¶ 1202.1, at 1202–10.

**19.** 5 *Collier on Bankruptcy, supra* note 7, ¶ 1225.01, at 1225–3.

§ 1225(a)(6). It is up to the court in each instance to determine whether these conditions have been satisfied. Thus, upon a finding that these conditions have been met, the court must approve the reorganization plan.

■ The second scenario is the confirmation of direct payment of impaired claims. Here, the court adopts *In re Erickson Partnership* and its tripartite test based upon sections 1222(a)(3), (b)(1), and 1225(a)(3). Construing these sections the court concluded that

> Chapter 12 of the Bankruptcy Code permits a "family farmer" debtor ... to directly pay creditors under his plan of reorganization, and not through the trustee, when ... b) the creditor's approved claim is modified, *if:* i) that creditor's claim receives the same treatment as other claims within a particular class of creditors, unless that creditor agrees to less favorable treatment; ii) that creditor's claim is not "preferred" to other "unsecured" creditors similarly situated, thereby discriminating against those creditors; iii) that creditor has established a self-monitor and remedy device in the event of plan obligation failure; *and* iv) the creditor does not object to direct payment.[20]

*Erickson,* 77 B.R. at 745 (emphasis in original).

This does not mean that the court and creditor are at the beck and call of the debtor, however, for satisfaction of the statutory requirements is a matter to be determined by the court only after a searching inquiry. This result follows from section 1225(a)(6), which requires the court to establish facts beyond those specified in the preceding five sections, all of which are readily ascertainable from the record itself without an extended or complex factual inquiry by the court. Therefore, while the court is compelled to confirm a plan which meets the statutory requirements of section 1225, the court is nevertheless an active participant in determining the extent to which the requirements have in fact been satisfied.

■ In addition to the statutory limitations placed on direct payments, the courts have also provided guidelines useful for determination of this issue. The following list of nonexclusive factors was promulgated by the court in *In re Pianowski* in an effort to determine when direct payments could successfully be made:

1. The past history of the debtor;
2. the business acumen of the debtor;
3. the debtor's post-filing compliance with statutory and court-imposed duties;
4. the good faith of the debtor ...;
5. the plan treatment of each creditor to which a direct payment is proposed to be made;
6. the consent, or lack thereof, by the affected creditor to the proposed plan treatment;
7. the legal sophistication, incentive and ability of the affected creditor to monitor compliance ...;
8. the ability of the trustee and the court to monitor future direct payments;
9. the potential for abuse of the bankruptcy system;
10. the existence of other unique or special circumstances.[21]

---

**20.** The *Erickson* court suggestion that creditor approval is necessary if direct payments are to be allowed is limited to the case of modified payments because the controlling statute, § 1222(a)(3), demands such a result. By contrast, direct payment of secured, *unmodified* claims may, but need not, be accompanied by such approval. This result obtains because the language of §§ 1225(a)(5)(A)–(C) sets forth three alternative provisions, each of which alone will justify approval of the direct payment. Simply stated, creditor approval is needed for confirmation of direct payment of modified claims, but not for unmodified claims.

**21.** In adopting these criteria, the Court rejects several other factors proposed by the *Pianowski* court because they are not consistent with the inquiry demanded by § 1225(a)(6). Specifically, the *Pianowski* court considered the potential burden on the Chapter 12 trustee and the possible effect upon the trustee's salary or funding of the U.S. Trustee system as relevant to the court's determination of whether direct payments may be permitted. *Pianowski,* 92 B.R. at 234.

> By contrast, section 1225(a)(6) requires only that the debtor be able to make payments and otherwise comply with the plan.

*Pianowski,* 92 B.R. at 233–34 & n. 6–17; *accord In re Martens,* 98 B.R. 530, 541 (Bankr.D.Colo.1989). In applying these factors, courts must also be aware of the number of creditors, the level of debt, and the frequency with which the debtor receives income. The overriding concern is that a trustee should not be compensated at the same rate for occasional distributions to a few creditors as he would for a complex reorganization requiring substantial supervision.

The foregoing factors illustrate the nature of the inquiry demanded by the construction of Chapter 12 as required by its statutory language and legislative history. These factors enable the court to inquire as to the practical implications of authorization with respect both to the debtor's ability to comply with the payment schedule and the trustee's ability to monitor the plan. Although these factors allow a degree of discretion, they are born of the statutory language itself and are meant only to determine whether the statutory requirements have been met. This Court is also mindful of the legitimate policy concerns with respect to the self-funding nature of the Trustee system and the perception that direct payments, if unchecked, could threaten to undermine the system altogether. Nevertheless, the approach adopted here will provide an adequate safeguard from encroachment by unqualified or unscrupulous debtors while retaining a degree of discretion and flexibility inherent in the courts of bankruptcy in the United States. Most important, this approach will preserve the spirit of Chapter 12, which

was designed to preserve from extinction a valued and integral facet of American life: the family farmer.

The Court is aware that the bankruptcy courts, already working to the limits of their capacity, will need to spend some additional time engaging in factual inquiries to resolve the issue of direct payments. Nevertheless, the Court is convinced that the time requirement will not be an onerous one. It is, of course, difficult to predict the frequency with which bankruptcy courts, following the model presented here, will find the authorization of direct payments to be merited. It is clear, however, that the debtors in Chapter 12 reorganizations enjoy a presumption of Congressional favor with respect to their applications for such payments. While no mechanical formula can be imposed, it is expected that the number of approved direct payments will increase rather than diminish under the test articulated here. Although the Court is cognizant of the potential perils of Chapter 12, we are duty-bound to interpret the words of Congress which, by virtue of their constitutional authority, they alone are empowered to speak. Any remedy, if indeed one is needed, must come from them, and not from this Court.[22]

## II. LIQUIDATING COSTS AND VALUATION

■ The second issue before the Court in this appeal is the question whether the hypothetical cost of liquidation should be subtracted from the value of collateral

---

The focus of the court's inquiry, then, must be upon the debtor and the circumstances relevant to his ability to pay, and upon those questions pertinent to the likelihood of compliance. The other factors enunciated by the *Pianowski* court and adopted here serve to inform the court's inquiry to this end. Nowhere, however, does the statute itself direct the court's attention to the livelihood or to the peculiar difficulties of an individual trustee or the U.S. Trustee system.

The *Pianowski* court also asked whether the debtor is likely to achieve meaningful reorganization absent direct payments. *Id.* at 233. This, too, is rejected to the extent the inquiry suggests that the direct payment may be denied simply because the court determines that

alternative repayment plans afford the same prospects for successful reorganization. The statute does not authorize the courts to interpose alternate, though reasonable, methods of payment. Although a different result might obtain where direct payments would afford no opportunity for reorganization, or at best only a dim hope, once the statutory requisites of section 1225 are satisfied, confirmation of the plan and its direct payments, if any, is mandatory.

22. The Court notes that the debtor raised a related issue on appeal: Whether attorney fees should be paid through the trustee. Because the debtor chose not to brief this issue, we will not consider it.

which the debtor proposes to retain and use for the production of income, thus reducing by that amount the value of the secured creditor's interest in the property. The appellants argue that such a reduction is proper because the creditor is entitled to no more than that amount he would be able to recover were the property to be sold to satisfy the lien. Thus, the value of the property should be reduced by the amount of unpaid taxes plus ten percent of the remaining balance to reflect the proceeds which would be lost as a consequence of the hypothetical sale. The result, they argue, is that the value of the disputed farm real estate which was subject to a mortgage lien by the Federal Land Bank is $324,000.00, less real estate taxes of $3,143.29 for an amount of $320,857.00, less an additional ten percent for the hypothetical liquidation, leaving a secured claim of $288,722.00. The appellee's position is that where the disputed property is to be held by the debtor under the reorganization plan, the value of the secured claim is not to be reduced by the amount of the supposed sale of the property. This result obtains as a consequence of the second sentence of section 506(a), which suggests that valuation is to be determined in light of the purpose of the valuation and the proposed use of the subject property. 11 U.S.C. § 506(a) (1988). Where the property is to be retained by the debtor, the creditor's interest is equal to the value of the property, since no sale is contemplated or necessary.

Once again, the starting point for analysis of this question is the language of section 506(a) itself, which provides:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim *to the extent of the value of such creditor's interest* in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. *Such*

> *value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property,* and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a) (1988) (emphasis added).

The first sentence of the statute indicates that the court is to establish the amount of the interest to which the secured creditor is entitled. Thus the inquiry must focus not on the value of the property itself, but rather on the value of the creditor's interest in that property. *In re Paige*, 13 B.R. 713, 714 (Bankr.S.D.Ohio 1981). Because a creditor would not ordinarily receive the subject property absent liquidation, and because the costs associated with liquidation would be deducted from the outstanding value of the property, a creditor is unlikely ever to receive the full amount of the value of the property. Indeed, this is precisely the risk all creditors take when they lend money. The creditor bargains for the right to take possession of the collateral and sell it in the event of default, thus incurring loss to the extent of the time and expense invested in the liquidation. Hence the creditor's interest in the property is, in a sense, always less than the fair market value of the disputed property. *See id.*

The second sentence of the statute directs that the value of the claim is to be determined by examining the purpose for the valuation as well as the contemplated disposition of the property. Several courts, as well as the appellee here, have asserted that the second sentence means that the debtor's continued use of the collateral affects the value of the property. *See Matter of Crockett*, 3 B.R. 365 (Bankr.N.D.Ill. 1980). Thus it is argued that the result of the valuation process would depend upon whether or not the property is retained by the debtor. If it is retained, no liquidation costs would be incurred, and the creditor's interest would be correspondingly greater. One court summarized the dilemma this way:

> Whether a valuation is made without regard for potential costs of liquidation

depends, it seems, upon the emphasis given to the first and second sentences of section 506(a). The first sentence, providing that the claim is secured to the extent of the value of the creditor's interest in the property, suggests that since it is the creditor's interest that is being valued and not the collateral itself, it should not make any difference whether the debtor is retaining the property. Yet, the language of the second sentence suggests that the proposed disposition or use of the collateral itself must be considered when determining that value.

*In re Claeys*, 81 B.R. 985, 990–91 (Bankr.D. N.D.1987).

The vast weight of authority, and the practice in this district, is to ascertain the extent of the creditor's interest by subtracting the cost of the hypothetical liquidation costs from the total value of the property. *In re Smith*, 92 B.R. 287 (Bankr.S.D.Ohio 1988); *In re Boring*, 91 B.R. 791 (Bankr.S.D.Ohio 1988); *In re Richardson*, 82 B.R. 872 (Bankr.S.D.Ohio 1987); *In re Paige*, 13 B.R. 713 (Bankr.S.D. Ohio 1981); *In re Neal*, 10 B.R. 535 (Bankr. S.D.Ohio 1981). This Court agrees with that method. The statute establishes a two-part inquiry to determine two separate issues. The second sentence requires that the court determine the value of the property itself. The first sentence directs the court to calculate the creditor's share of that value once it has been established. Thus, once the value of the property has been determined "in light of the purpose of the valuation and of the proposed disposition or use of such property," the "creditor's interest in the estate's interest" must be established by determining what the creditor could recover if the collateral were to be disposed of in a commercially reasonable way. This district has routinely used the figure of ten percent, based upon seven percent real estate brokerage fees, customary in this area, and an additional three percent to cover miscellaneous costs. *In re Smith*, 92 B.R. at 290. Of course, the ten percent figure is used in lieu of actual cost

figures. *Id.* Therefore, where actual figures are available, the court must use those figures as a basis for its calculations. *See id.*

It is true, as the appellees claim, that the proposed use of the property is a significant factor in the valuation process. The statute

> makes it reasonably clear that any valuation of collateral is temporal, and must take into consideration ... the contemplated disposition or use of the collateral.... The questions presented by a valuation of property pursuant to section 506(a) may be substantially different, depending upon whether it is proposed that (1) the property be disposed of, or (2) the property be retained or used by the debtor.

3 R. Babit, A. Herzog, H. Novikoff & M. Sheinfeld *Collier on Bankruptcy* ¶ 506.04[2] at 506–25, –26. The history of the statute also supports this interpretation. The House Report stated:

> "Value" does not necessarily contemplate forced sale or liquidation of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.[23]

The statute and its history suggest that value is not a static determination, but rather must be determined upon the basis of the circumstances peculiar to each case. However, "[t]he fact that a debtor intends to retain the collateral does not emasculate the fact that *it is in the first instance the creditor's interest* in the collateral that must be valued." *In re Claeys*, 81 B.R. 985, 991 (Bankr.D.N.D.1987) (emphasis added). Thus the issue of determining value is separate from and antecedent to the determination of the creditor's share of the valuation. Because the bankruptcy court in this case erred when it failed to allow for a deduction of liquidation costs in determining the amount of the Federal Land Bank's

---

**23.** H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 357, *reprinted in* 1978 *U.S.Code Cong. & Admin.* *News* 5787, 5963, 6312.

secured claim, its judgment must be RE-MANDED for a determination of the reduction in the value of the secured collateral sufficient to reflect the real or anticipated costs of the hypothetical sale of the property.

### III. ABANDONMENT OF COOPERATIVE STOCK

■ The debtors raise, as their final argument, one of the two issues addressed by this Court in *In re Shannon*, 100 B.R. 913 (S.D.Ohio 1989). They contend that the court below erred in confirming the plan subject to the condition that the debtors retain their stock in the Federal Land Bank, now the Farm Credit Services of Mid–America. There is no need for the Court to revisit the arguments presented by the very same counsel in *Shannon* since repetition would accomplish nothing. It is sufficient to note that *Shannon* thoroughly repudiates the debtors' position and the rejected line of bankruptcy court cases which they cite.

The debtors present no argument why the analysis of the statutory language and legislative history in *Shannon* was incorrect, but instead rely on a number of cases issued by bankruptcy courts. Apparently, the debtors wish to argue that the weight of authority favors their position in spite of *Shannon*. To bolster their argument, the debtors also rely on a case which pre-dated the Court's decision in *Shannon*, *In re FCX Inc.*, 853 F.2d 1149 (4th Cir.1988), in what the debtors characterize as a related matter. The Overholts use *FCX* to revive the same argument presented in *Shannon:* the fresh start purpose of the bankruptcy code entails that its strictures trump contrary non-bankruptcy provisions. *See also In re Massengill*, 73 B.R. 1008, 1012 (Bankr. E.D.N.C.1987), *rev'd*, 100 B.R. 276 (1988) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

In *Shannon*, however, the Court criticized the line of cases advanced by the debtors as being based on the reversed decision of *In re Massengill*, 73 B.R. at 1008. *See Shannon*, 100 B.R. at 921–22 & nn. 17–18. The Court's rejection of *Massengill* was obviously a rejection of those cases which relied upon *Massengill* or its rationale. Also, the Court repudiated the argument that the fresh start purpose of the bankruptcy code means that it takes precedence over specific non-bankruptcy law. *Id.* at 918–20, 922. Therefore, in light of this Court's opinion in *Shannon*, it is difficult to conclude that the appellants' argument "is warranted by existing law," or that the appellants have made a colorable argument "for the extension, modification, or reversal of existing law." Fed.R. Civ.P. 11. They make no good faith argument to distinguish this Court's holding in *Shannon* and it is futile to argue that the weight of authority in the various jurisdictions supports their position when the *Shannon* opinion provided the bankruptcy court with binding authority requiring the bankruptcy court to hold as it did.

Accordingly, the Court hereby imposes sanctions upon the appellant in an amount equal to the costs incurred by the appellee in connection with researching and briefing this issue. The appellee is directed to submit to the Court an itemized list of the hours spent in preparation of the issue, as well as any miscellaneous expenses directly related to such preparation. The Court admonishes counsel in the future to frame his arguments in a way that will serve to advance the interests of his clients as well as the law, and not to impede the administration of justice in this Court or any other by interposing without distinction arguments which have been explicitly rejected.

The Court, therefore, declines to revisit the law as articulated in *Shannon*.

WHEREUPON, upon consideration and being duly advised, the Court AFFIRMS the bankruptcy court insofar as it excluded from the Plan provisions for the surrender and retirement of the Land Stock. The Court also AFFIRMS this bankruptcy court's decision to route the attorneys' fees through the trustee. The Court, however, REVERSES the bankruptcy court on the issue of direct payment of impaired claims to creditors free of the trustee's percentage fees. The Court also REVERSES the bankruptcy court decision to the extent it

refused to reduce by the amount of the hypothetical or anticipated costs of liquidation the secured claims on collateral to be retained by the debtor. Therefore, the Court VACATES the confirmation order and directs the bankruptcy court to reexamine the proposed direct payments in light of this Court's directions, and to reexamine the proposed reduction in the creditor's interest in the retained collateral to determine which of the alternative methods of calculation is appropriate, either the estimated costs of liquidation or the ten percent reduction customary in this district.

IT IS SO ORDERED.