**In re Cecil GREEN and Ann Renae Green a/k/a Ann Renae Beck, Debtors.**

**Bankruptcy No. 4–92–6222.**

United States Bankruptcy Court, D. Minnesota.

March 1, 1993.

Stephen P. Thies, Chanhassen, MN, for debtors.

Thomas J. Lallier, Mackall, Crounse & Moore, Minneapolis, MN, for General Motors Acceptance Corp.

Stephen Creasey, Minneapolis, MN, for Chapter 13 Trustee.

## MEMORANDUM ORDER

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 11th day of November, 1992, on confirmation of the debtors' chapter 13 plan. *Amicus* briefs [1] were submitted by Linda Jeanne Jungers for Ford Motor Credit Co., Thomas E. Hoffman for Norwest Bank Minnesota,

---

1. Parties filing *amicus* briefs have emphasized the significance of this case to parties that finance the purchase of automobiles for consumer use in this district. In its brief, Norwest Bank has indicated that the difference between assigning retail versus wholesale value represents in excess of $850,000 in the value of its secured claims in pending chapter 13 cases in the Twin Cities area alone. Ford Motor Credit Co. states that at the national level, the difference represents approximately $26,600,000 in the value of its secured claims annually.

Daniel W. Stauner for Community Credit Co, and Thomas Sandstrom for Cityside Savings and Financial Services Co.

## FACTUAL BACKGROUND

On September 30, 1989, Cecil and Ann Renae Green (the "debtors") purchased a 1989 Hyundai Excel pursuant to a retail installment sales contract for $9,252.74. The contract was assigned to General Motors Acceptance Corporation ("GMAC"). GMAC holds a security interest in the vehicle pursuant to the contract, and it duly perfected its security interest under Minnesota law.

On September 11, 1992, the debtors filed a joint petition under chapter 13. At the time of filing, the remaining balance on the contract was $3,945.82, and the debtors intend to retain and use the vehicle for normal purposes. The debtors filed a chapter 13 plan along with their petition wherein they propose to allow GMAC's lien to remain in effect, and to pay GMAC $1,925 plus interest over approximately two years on its allowed secured claim. The balance of GMAC's claim would be paid approximately 19% over the life of the chapter 13 plan as a general unsecured claim.

On October 15, 1992, GMAC objected to the plan arguing that it failed to provide GMAC with the allowed amount of its secured claim.

## POSITIONS OF THE PARTIES

GMAC and *amici* take the position that the allowed amount of GMAC's claim is $2,875 based on the September 1992 NADA Official Used Car Guide (Midwest Edition) *retail* value for a 1989 4–door Hyundai Excel Sedan. Since the present value of the payments to be made to GMAC on account of its allowed secured claim is only $1,925, GMAC and *amici* argue that the plan should not be confirmed.

The debtors argue that the allowed amount of GMAC's secured claim is only $1,925 based on the September 1992 NADA

Official Used Car Guide (Midwest Edition) *wholesale* value for a 1989 4–door Hyundai Excel Sedan. Since the present value of payments to be made under the plan is $1,925, the debtors assert that the plan should be confirmed.

The debtors and GMAC have stipulated that $1,925 and $2,875 are the appropriate wholesale and retail values respectively, according to the September 1992 issue of the NADA Official Used Car Guide (Midwest Edition).

## LEGAL ANALYSIS

The case before me today requires a determination of the proper method of valuing an undersecured creditor's allowed secured claim for the purpose of confirming a chapter 13 plan that a debtor proposes to cram-down on such creditor. There are a multitude of published cases on this issue.[2] The only thing more staggering than the sheer number of the decisions is the variance among them. One case in this district directly addressed the proper method of valuation in confirming a plan that proposes to cram-down a secured creditor in the chapter 11 context. *In re Bergh*, 141 B.R. 409 (Bankr.D.Minn.1992). However, there are no cases decided by the United States Bankruptcy Court for the District of Minnesota, the United States District Court for the District of Minnesota, or the Eighth Circuit Court of Appeals addressing the specific issue of whether to use wholesale or retail, and whether to deduct costs, when valuing an undersecured creditor's allowed secured claim in the context of a cram-down in chapter 13.

Accordingly, analysis starts with the text of the statute, construing its terms according to their plain meaning. *Patterson v. Shumate*, —— U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992); *Toibb v. Radloff*, 501 U.S. ——, ——, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991). In so doing, each term must be given effect so as to avoid rendering any part of the statute inoperative. *United States v. Nor-*

**2.** GMAC lists 73 cases in its brief, and I have found several others but I doubt that even I have compiled an exhaustive list.

*dic Village, Inc.,* — U.S. —, —, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). If a term is unambiguous, its plain meaning controls without reference to the legislative history, except in the rare circumstance where use of the plain meaning would produce a result clearly at odds with the legislative intent. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987); *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991). If a term is ambiguous, the term should be construed consistently with other terms in the statute so as to produce a symmetrical whole and avoid creating tension in the statute. *Federal Power Commission v. Panhandle Eastern Pipeline Co.,* 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949); *see also Freytag v. Commissioner of Internal Revenue,* — U.S. —, —, 111 S.Ct. 2631, 2638, 115 L.Ed.2d 764 (1991). In so construing ambiguous terms, the legislative history should be consulted to determine the meaning that fits most logically into the *corpus juris.* *West Virginia University Hospitals v. Casey,* — U.S. —, —, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991); *see also Freytag,* — U.S. at —, 111 S.Ct. at 2638.

Section 1325(a)(5)(B) of the Bankruptcy Code provides that if a debtor in chapter 13 intends to retain property subject to a lien and the party holding the allowed secured claim does not accept the plan, the chapter 13 plan must still be confirmed where:

  (i) the plan provides that the holder of such claim retain the lien securing such claim; and

  (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim.

11 U.S.C. § 1325(a)(5)(B). Here, the plan provides that GMAC will retain its lien, so the sole question is whether the value of payments to be made under the plan equals the allowed amount of GMAC's secured claim. The amount of GMAC's secured claim is determined according to the dictates of section 506(a) which provide in relevant part:

  An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

One line of cases interpreting section 506(a) determines that the critical language of section 506(a) is the language of the first sentence which provides that the creditor's claim is secured to the extent of the value of *such creditor's interest* in the estate's interest in such property. *See, e.g., GMAC v. Mitchell (In re Mitchell ),* 954 F.2d 557, 560 (9th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992); *Overholt v. Farm Credit Services (In re Overholt ),* 125 B.R. 202, 214 (S.D.Ohio 1990); *In re Robbins,* 119 B.R. 1, 3 (Bankr. D.Mass.1990); *In re Smith,* 92 B.R. 287, 290–91 (Bankr.S.D.Ohio 1988); *In re Boring,* 91 B.R. 791, 795 (Bankr.S.D.Ohio 1988); *In re Claeys,* 81 B.R. 985, 990–91 (Bankr.D.N.D.1987). According to such language, the property interest being valued is the creditor's lien interest in the collateral and not the debtor's ownership interest. These courts then reason that a lien is simply a right to take possession of the collateral and sell it in satisfaction of an obligation. Therefore, the value of the lien is equal to the amount the creditor

could receive upon sale of the collateral. *Grubbs v. National Bank of South Carolina (In re Grubbs)*, 114 B.R. 450, 451 (D.S.C.1990); *Valley Nat'l Bank v. Malody (In re Malody)*, 102 B.R. 745, 749 (Bankr. 9th Cir.1989). Such reasoning generally results in two conclusions: First, the appropriate value of the lien interest should be based on the wholesale value of the collateral rather than its retail value, since the creditor is generally not considered a "dealer" in the collateral and therefore could not sell it at retail; and second, costs of sale should be deducted from the value of the collateral to arrive at the value of the lien interest, since such costs would have to be incurred by the creditor in taking possession of and selling the collateral. *See, e.g., Mitchell*, 954 F.2d at 560 (wholesale rather than retail); *Grubbs*, 114 B.R. at 451–52 (same); *Malody*, 102 B.R. at 750 (same); *Robbins*, 119 B.R. at 4 (deduct costs of sale); *Overholt*, 125 B.R. at 215 (same); *Smith*, 92 B.R. at 290 (same); *Boring*, 91 B.R. at 795 (same); *Claeys*, 81 B.R. at 992 (same).

A second line of cases, including Judge Kressel's decision in *Bergh*, focuses instead on the language of the second sentence of section 506(a) which provides that the creditor's lien interest must be valued in light of *the purpose* of the valuation and *the proposed disposition or use* of the collateral. *See, e.g., Brown & Co. Securities Corp. v. Balbus (In re Balbus)*, 933 F.2d 246, 248–51 (4th Cir.1991); *GMAC v. Johnson (In re Johnson)*, 145 B.R. 108, 115 (Bankr. S.D.Ga.1992); *In re Arpaia*, 143 B.R. 587, 589 (Bankr.D.Conn.1992); *In re Bergh*, 141 B.R. 409, 419 (Bankr.D.Minn.1992); *In re Dinsmore*, 141 B.R. 499, 509 (Bankr. W.D.Mich.1992); *In re Landing Assoc., Ltd.*, 122 B.R. 288, 294 (Bankr.W.D.Tex. 1990); *Beacon Hill Apts., Ltd. v. Columbia Sav. & Loan Ass'n (In re Beacon Hill Apts., Ltd.)*, 118 B.R. 148, 150–52 (N.D.Ga. 1990); *Wolk v. Goldome Realty Credit Corp. (In re 222 Liberty Assoc.)*, 105 B.R. 798, 803–04 (Bankr.E.D.Pa.1989); *In re Courtright*, 57 B.R. 495, 496–97 (Bankr. D.Or.1986). Since the value of the creditor's lien is to be determined in light of the debtor's intended use of the collateral and

the purpose of the valuation, these courts conclude that the value will be dictated by the facts of each particular case. Where the debtor proposes to retain and use the collateral, and the purpose of the valuation is to determine the amount that an undersecured creditor will be paid on its secured claim under the debtor's plan, the value of the creditor's lien is derived from the stream of payments that the lien secures, rather than the right to foreclose, since no liquidation of the collateral is contemplated. Accordingly, the courts focusing on the second sentence of section 506(a) generally reach conclusions directly contrary to the courts that focus on the first sentence, *i.e.*: The value of the lien should be based on the retail value of the collateral since such is the replacement value to the debtor; and the costs associated with sale of the collateral should not be deducted since no sale is contemplated. *See Johnson*, 145 B.R. at 115 (retail value rather than wholesale); *Arpaia*, 143 B.R. at 590 (fair market value rather than forced-sale value); *Bergh*, 141 B.R. at 420 (going-concern value of business rather than in-place value of individual assets); *Dinsmore*, 141 B.R. at 510 (costs should not be deducted); *Landing Assoc.*, 122 B.R. at 294 (same); *Beacon Hill Apts.*, 118 B.R. at 152 (same); *222 Liberty Assoc.*, 105 B.R. at 804 (same).

I believe that the latter approach is the better reasoned of the two. It is the only approach that gives meaning to all of the terms of section 506(a), and it is the only approach consistent with the "plain meaning rule" recently espoused by the Supreme Court in the bankruptcy context. *See Patterson v. Shumate*, ___ U.S. ___, ___, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992); *Toibb v. Radloff*, 501 U.S. ___, ___, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991). In cases where the debtor proposes to retain and use the collateral, valuation of the lien based on the price the creditor would receive upon sale, net of costs, fails to acknowledge the fact that no such sale is contemplated. On the contrary, the debtor intends to retain the collateral and pay the creditor based on the amount of such credi-

tor's interest therein. Furthermore, valuation based on a hypothetical sale ignores the purpose of the valuation which is to determine the amount an undersecured creditor will be paid for the debtor's continued possession and use of the collateral, not to determine the amount such creditor would receive if it had to repossess and sell the collateral. If the creditor's lien is always valued at the amount that the secured creditor would receive upon disposition of the collateral, the second sentence of section 506(a) would be rendered ineffective.

The Ninth Circuit in *GMAC v. Mitchell,* (*In re Mitchell*), 954 F.2d 557, 560 (9th Cir.1992), responds that valuation of the creditor's interest based upon the amount the creditor could receive upon sale of the collateral does not ignore the second sentence of section 506(a) because the purpose of the valuation and the proposed disposition or use of the collateral can have an impact on the amount that the creditor would receive in such a sale. *Mitchell,* 954 F.2d at 560. However, the formulation used in *Mitchell* gives inadequate deference to the "purpose and use" language of the second sentence of section 506(a), because the purpose and use would only affect the value of the creditor's interest in rare cases. In fact, the Ninth Circuit suggests that the debtor's proposed use of the collateral will only affect the value of the creditor's lien where the collateral can be valued as part of a going concern, or where the debtor's use is particularly beneficial or detrimental to the value of the collateral. *Mitchell,* 954 F.2d at 560.

It has been argued that valuing the lien interest based on the retail value of the collateral without deduction for costs of sale effectively writes out the first sentence of section 506(a) because it measures the value of the debtor's ownership interest in the collateral rather than the creditor's lien interest. I disagree. It is true that the plain meaning of the first sentence of section 506(a) requires a valuation of the creditor's lien interest in the collateral. However, the fact that a lien in property gives the lienholder a right to repossess and sell the collateral does not automatical-

ly mean that the value of the lien is equal to the amount that the creditor would receive upon disposition of the collateral in satisfaction of its lien. It must be remembered that a lien is fundamentally a *security* interest which secures payment of an obligation. To value such an interest in property based solely on the amount that could be realized upon sale of the collateral ignores the value associated with the right to receive the stream of payments that the lien secures. Although it is not such right to payment that is being valued, the amount of the payments the lien secures will surely impact the value of the lien itself. Thus, where the debtor proposes to retain the collateral and pay the creditor in satisfaction of its lien, valuing the lien based on the stream of payments the creditor should receive, rather than the amount the lienholder would receive upon disposition of the collateral, does not ignore the fact that it is the lien interest that is being valued.

Valuing the lien based on the amount that the secured creditor would receive upon disposition of the collateral would also be inconsistent with the Supreme Court's holding in *United Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In *Timbers,* the Supreme Court ruled on the nature of a creditor's interest entitled to adequate protection under section 362(d)(1). In so ruling, the Court observed that the interest being protected under section 362(d)(1), like the interest being valued under section 506(a), is merely a security interest, which is a right to have the collateral applied in satisfaction of a debt, not a right to immediate possession of the collateral. *Timbers,* 484 U.S. at 370–72, 108 S.Ct. at 630–31. Where the value of the collateral is less than the amount owed to the secured creditor, the Court stated that "[t]he phrase 'value of such creditor's interest' in section 506(a) means 'the value of the collateral.'" *Id.,* 484 U.S. at 372, 108 S.Ct. at 631. It would run contrary to *Timbers* to hold that the value of an undersecured creditor's lien interest

**506**

is some amount less than the full value of the collateral.

## CONCLUSIONS

 A chapter 13 plan, wherein the debtor proposes to retain and use an encumbered vehicle, can only be confirmed if the payments to the undersecured creditor holding the lien on the vehicle have a present value equal to the current NADA retail value of the vehicle without deduction for costs of repossession or sale. In such cases the debtor proposes to continue its retention and use of the vehicle, so no repossession or sale is contemplated. The purpose of the valuation is to determine the amount that the undersecured creditor will be paid for the debtor's continued use and possession of the vehicle which secures the debtor's obligation. The value of the creditor's interest in such case is derived from the stream of payments the collateral secures. To value the creditor's interest based on the wholesale value that the creditor would receive upon disposition of the vehicle, or to deduct the costs of such sale, effectively writes out the second sentence of section 506(a). Furthermore, using such values would be contrary to Supreme Court precedent.

Applying these principles to the present case, I determine the amount of GMAC's allowed secured claim to be $2,875. I therefore conclude that confirmation of the debtor's chapter 13 plan must be denied because the plan proposes to make payments to GMAC on its allowed secured claim having a present value of $1,925.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. Confirmation of the debtors' chapter 13 plan is DENIED; and

2. The debtors shall have 10 days in which to file an amended chapter 13 plan.